THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HERMAN ZAJICEK, (*alias* Herman Bilik,) Plaintiff in Error.

*Opinion filed February 20, 1908—Rehearing denied April 9, 1908.*

1. CRIMINAL LAW—*when inaccurate instruction is not ground for reversal.* An instruction in a murder trial which, in defining the duties and rights of the court, jury and counsel, contains the inaccurate statement that "it is for counsel to argue the case as to such counsel it may seem proper," is not ground for reversal in the absence of any showing that the prosecutor made improper argument, to which the court's approval was given by the instruction.

2. SAME—*when improper remark by counsel is not ground for reversal.* The making of an improper remark by the prosecutor,

in a murder trial, with reference to the effect of a verdict of acquittal, which remark is withdrawn immediately upon the sustaining of defendant's objection thereto, is not reversible error.

3. SAME—*jury may consider fact that defendant's testimony is corroborated or contradicted.* In a criminal case it is not improper to instruct the jury that in determining the degree of credibility which should be given to the testimony of the defendant they were at liberty to take into consideration the fact, if such was the fact, that he had been corroborated or contradicted by credible evidence or by facts or circumstances proven on the trial.

4. SAME—*jury not authorized to disbelieve as jurors if, from the evidence, they believe as men.* It is not improper, in a criminal case, to instruct the jury that they are not at liberty to disbelieve as jurors if, from the evidence, they believe as men, and that their oath imposes upon them no obligation to doubt where no doubt would have existed if no oath had been administered.

5. SAME—*when form of instruction does not render it erroneous.* The fact that an instruction attempting to explain the term "reasonable doubt" contains several propositions, each of which is a correct statement of the law and might have been the subject of a separate instruction, does not, of itself, render the instruction bad.

6. SAME—*a reasonable doubt must arise from the evidence or lack of evidence.* An instruction for the defendant in a murder trial is properly refused which contains the statement that the jury are not called upon to say, on their oath, that they are morally certain as jurors if they have "a reasonable doubt as men," since the reasonable doubt which warrants an acquittal is a doubt which arises from the evidence or lack of evidence.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ALBERT C. BARNES, Judge, presiding.

On March 2, 1907, the grand jury of Cook county returned an indictment against Herman Zajicek, *alias* Herman Bilik, *alias* Professor Herman, charging him with the murder of Mary Vrzal. Upon a trial before a jury in the criminal court of that county, at the June term, 1907, he was found guilty and his punishment fixed at death. After overruling motions for a new trial and in arrest of judgment he was sentenced by the court to be hanged on October 11, 1907. Upon the motion of defendant the time

of execution was stayed until November 8, 1907. The record has been brought to this court for review.

Plaintiff in error, commonly known as Herman Bilik, was at the time of the trial a man forty years of age. He was born in Volfert, Germany, where he was married and lived until he reached the age of nineteen years, when he left his wife and came to Cleveland, Ohio. Here he remained the greater part of the time, engaged in various occupations until the year 1900, when he moved with a second wife and two children, with whom he was living at the time of his arrest, to the city of Chicago. After coming to Chicago his sole occupation was that of a palmist and fortune teller.

In July, 1904, Martin Vrzal lived with Rosie Vrzal, his wife, and family, in a three-story frame building owned by him at 377 West Nineteenth street, in that city. Vrzal was engaged in the milk business, and the basement of the building in which he lived was used by him as a milk depot. The first and second floors were occupied by the family as living apartments and the third floor was rented to Mary Lorenz. At this time the Vrzal family, in addition to the parents, consisted of seven children, whose names and ages were as follows: Emma (now Mrs. Neamann) twenty-three; Mary, twenty; Tillie, eighteen; "Jerry," about fifteen; Rosie, Jr., twelve (hereinafter referred to as Rosie); Ella, ten, and Bertha, five years of age. Martin Vrzal and his wife were Bohemians and could neither read nor speak English. The property in which they lived was valued at about $3000, and Vrzal had $2000 on deposit in one of the banks of the city. From his milk business he received an income of $40 per week, and Emma, Mary and Tillie had employment by which they earned a total of $30 a week, the most of which they turned over to their mother. Members of the family carried life insurance in the following amounts: Martin $1100, Mary $800, Tillie $620, Rosie $150 and Ella $105, all of which was payable to Mrs. Vrzal. The mem-

bers of the family who had reached years of discretion were very ignorant and very superstitious.

On March 26, 1905, Martin Vrzal died; Mary died July 27, 1905; Tillie died December 27, 1905; Rosie died August 29, 1906; Ella died November 30, 1906, and Mrs. Vrzal died December 5, 1906. During the month of December, 1906, the bodies of all these persons, except Mrs. Vrzal, were exhumed by the coroner of Cook county. An autopsy was conducted. Certain of the abdominal organs were taken from the body of each and examined by Prof. Walter S. Haines, of Chicago, an eminent toxicologist of great skill and learning and of long experience in his profession. He found that each of the bodies contained arsenic in quantity sufficient to cause death. His view was confirmed by Prof. Marc Delafontaine, a chemical analyst, who conducted an independent examination of a part of the organs. Each of the Vrzals whose bodies were so exhumed died apparently from the same cause. Their symptoms were identical and were those of arsenical poisoning, although the certificates of death given by the physicians attending them assigned other causes.

In July, 1904, Bilik began to purchase milk from Martin Vrzal and was soon on the most intimate terms with the entire family. Shortly after making their acquaintance he informed them that he was a fortune teller and a palmist, and professed to be able, through the working of "charms," to accomplish anything he desired. He stated that he could charm people so that they would live together or that he could separate them; that he could arrange and settle love affairs and business matters of all kinds, and that if people did not do as he desired he could "fix" them. On one occasion he stated to the Vrzals that he could kill people in a manner that could not be detected, and at another time he stated, "I know of some poisons that will kill very slow and no doctor will ever know that they were poisoned." The Vrzals believed that Bilik possessed the powers which

he pretended to have. After he had known Bilik about a month, Martin Vrzal employed him to work a "charm" upon a competitor who lived across the street, for which he paid him $20. Mr. and Mrs. Vrzal were anxious to have their daughter Emma marry a young man by the name of Rost, who had for some time kept company with her but whose attentions had ceased. They spoke to Bilik about it, and he replied that he could bring about the desired result but that it would cost considerable money, as he would have to get some herbs at Saratoga or Syracuse, New York, to work the charm. Thereupon he was given $40 by Mr. and Mrs. Vrzal, and in a few days, upon his pretended return from the east with the herbs, he was given $50 more. Thereafter he borrowed and obtained at different times, on various pretenses, sometimes from Martin Vrzal and sometimes from Mrs. Vrzal, sums of money which the evidence tends to show aggregated an amount between $5000 and $7000. On the trial Bilik admitted that he had received $700, that the claims made by him to the Vrzals were false and that he had taken advantage of their credulity to obtain their money. Bilik became almost a constant visitor at the Vrzal home, and in a short time his relations with Mrs. Vrzal became unduly intimate. He learned the amount of life insurance carried by the various members of the household and was advised about all their family affairs.

In November, 1904, Martin Vrzal, in Bilik's presence, complained of rheumatism in his leg. Bilik told him he could cure him, and a day or so after delivered to him a pint bottle filled with some kind of a liquid, in the bottom of which was a white powder that did not dissolve. Bilik instructed him to shake the bottle before using and take a tablespoonful three times a day. Vrzal took the medicine, which Bilik testifies was whisky and saltpetre, as directed. Shortly after taking a dose of the mixture Vrzal would vomit. This Bilik explained to him was absolutely essential and the proper way for the medicine to work. Vrzal

soon began to have pains in his stomach and a burning sensation in his throat. The first bottle of medicine lasted about two weeks and the bottle was then re-filled by Bilik. From this time Martin's illness became more serious but he continued taking Bilik's preparation. The skin on his face and hands turned yellow, his lips were raw, his limbs became paralyzed, his eyes became swollen and inflamed, and he finally lost his sight.

About the first of March, 1905, Bilik was in Cleveland, Ohio. At the request of Vrzal a telegram was sent to Bilik asking him to come and see Vrzal at once. Upon an answer from him stating that he had no money, $10 was sent him and Bilik immediately came to Chicago. That night he slept at the Vrzal home, and the next morning, in a conversation with Mrs. Vrzal, he was heard to say: "Your husband is very bad; I will go back to Cleveland and I will send you a powder back in a special delivery message; you give it to your husband; now I have to have $10 to go back to Cleveland." At eleven o'clock in the night of the following day a special delivery letter addressed to Mrs. Vrzal, postmarked Cleveland, Ohio, was delivered to her. In the letter was a little black bag which contained a white powder. This powder was given to Martin by Mrs. Vrzal from time to time. He continued to grow worse, however, until he died, on March 26, 1905.

During the night that Bilik stayed at the Vrzal home, above referred to, Jerry Vrzal, according to his testimony, while in the same room with Bilik and his mother, overheard the following conversation between them:

Bilik: "Is that boy all right there?

Mrs. Vrzal: "Yes.

Bilik: "You know in a few days your husband will be dead and the other ones; we will get them out of the way also; and if the kid will stick to us and won't say anything we will take him with us also; if he says anything on me I will fix him."

The boy also testified that Bilik said "after he would do that he would get his mother and wife out of the way, and for the money that will be left they will go to Europe, and if I (the witness) would dare squeal they would fix me."

Frank Ziemann, a photographer, lived on the opposite side of an elevated railroad, thirty feet distant from the Vrzal home. He testified that about three weeks before Martin's death he saw Bilik go into the Vrzal house, look around as if to see whether others were present, take a pint bottle from his pocket, unwrap the paper therefrom and hand it to Mrs. Vrzal. They then went together into the bed-room, where they remained about five minutes. Then they returned to the kitchen and went outside, when Ziemann heard Mrs. Vrzal say to Bilik, "Do you think they will ever know it?" and heard Bilik reply, "No, they will never know it."

On May 15, 1905, Mary Vrzal was examined for life insurance by Dr. Ciser, and at that time was found to be a strong, well developed, healthy girl. She was employed as a tailoress by Price & Co. It appears that Mary, while talking to her mother, had protested against giving any more money to Bilik, telling her that if she did not stop it she would leave home,—that she would not work for him. This conversation was afterwards related to Bilik by Mrs. Vrzal, and according to the testimony of Emma, he then remarked that he would "fix her."

During the summer months of 1905, Bilik, with his wife and family, lived in a tent at Riverside, where he told fortunes. Mary visited him there two or three different times and he frequently came to her home. Shortly after her return from her first visit, during the latter part of June or the first of July, she complained of pains in her stomach and would frequently vomit. Thinking it was bowel or stomach trouble, she went to Dr. Novak, who prescribed for her. A few days later, while Mary was taking some of Novak's medicine, Bilik came in. He inquired what she was taking

and advised her to throw it away, and told her that if she would give him a quarter he would get her some medicine. Mary gave him the quarter, and that evening he returned with a bottle containing a liquid similar to the mixture he had given Martin Vrzal. He directed her to shake the bottle before taking and to take a dose three times a day. This medicine was taken by Mary each morning and evening, and it apparently affected her in the same manner that Martin Vrzal had been affected. Eating or drinking would be followed by vomiting. A few days later, while Bilik was at her home, he was informed of her continued trouble and he told her that he would bring her something that she could eat. In a few days he appeared at the house with some chopped meat, which he said was for her. On that day she ate some of it for her dinner and supper, and on each of the next two days she took some of it with her to her work for lunch. Each time she ate the meat she became sick and vomited. On each of the days she took the meat with her to her work she gave some of it to her friend Josephine Riha, who after eating it was similarly affected.

According to the testimony of Jerry, on the second Sunday before Mary's death Bilik came to their house, entered the kitchen where Jerry was sitting, reading a book, and told Mrs. Vrzal to make some coffee, saying to her, "Ma, I know you make good coffee." Mrs. Vrzal prepared the coffee, poured it into cups placed on a table in the kitchen and then went into the pantry. Bilik sat down at the table in front of one of the cups and looked at Jerry to see if he was watching. Apparently concluding that he was not, Bilik took a small bottle containing a white powder from his pocket, poured some of the powder into one of the cups and then put the bottle back in his pocket. The girls, who were sitting on the front porch, were then called in by Mrs. Vrzal. As they were being seated at the table, Emma was about to take the chair in front of the cup in which the powder had been placed, when Bilik told Mary

that she should sit there. Emma also testified that Bilik directed Mary where to sit at the table. That evening Emma and Mary had planned to go to the theater. An hour or so after drinking the coffee Mary became very sick, vomiting and complaining of violent pains in her stomach. This continuing all evening, the theater party was given up.

During the first part of July Mary had two weeks' vacation, and on Monday of the following week, as she was preparing to go to work, her mother said to her that she had better stay at home, as she looked awful bad. Bilik was there at that time and said to Mrs. Vrzal: "You ought to keep that girl at home; she looks awful bad, and people will think there is something the matter with her if they see her vomit." The following day she remained in bed, and within a week, on July 27, 1905, she died. During the last few days of her illness she vomited more frequently and the pains in her stomach became more severe; her limbs became paralyzed and her hands became stiff; her lips and tongue were raw and the skin on her face and hands became a yellowish brown; her eyes were bloodshot and swollen; her throat burned and she had an intense thirst. Upon the examination of portions of the stomach, liver and kidneys taken from her body after her death, it was estimated that these organs contained not less than twelve grains of arsenic.

The evening before Mary Vrzal died, Maria Fencl and Mrs. Vrzal went to Riverside, where they saw Bilik. Mrs. Fencl testified that while there Bilik requested Mrs. Fencl to let him have a private conversation with Mrs. Vrzal, saying that they had something important to tell each other. Bilik and Mrs. Vrzal then walked away a short distance and talked together for about ten minutes. On the way home that night, while talking of Mary's sickness, Mrs. Vrzal told Mrs. Fencl that Mary would die within three days. A few days before this, when Emma and two of her friends were at Riverside having their fortunes told,

Emma swears that Bilik, when telling her fortune, told her that she would soon be in mourning.

Within the next eighteen months, Tillie, Rosie and Ella died in the order named, in much the same manner as their father and sister Mary. During the illness of Tillie and Rosie, Bilik pretended to treat them and furnished white powders or other medicines for them to take. On December 3, 1906, three days after the death of Ella, an account of the deaths of the members of the Vrzal family was published in the *Chicago American*, and on that day Mrs. Vrzal was called to the police station. She was permitted to return home that evening but seemed greatly worried. At this time she was living with a cousin, Mrs. Katie Engelthaler, having sold the Vrzal property to Mr. Neamann, to whom Emma had been married. About nine o'clock the morning after Mrs. Vrzal had been at the police station Bilik called at the Engelthaler house, where he found Jerry, Bertha and Mrs. Vrzal, the latter sick, lying on a bed in the bed-room. In a few minutes Jerry, according to his testimony, was asked by Bilik to do an errand for him and was gone about fifteen minutes. While he was away Bilik remained with Mrs. Vrzal in the bed-room, and when Jerry returned he noticed a roll of bills in his mother's hand and she was in the act of giving money to Bilik. Jerry was then asked by Bilik to go down to Eighteenth and Halsted streets, and after obtaining his mother's permission he and Bilik left the house together. Jerry returned home about noon. Between twelve and two o'clock of that day he entered his mother's bed-room, where she was arranging the bed, and noticed lying thereon a bottle about five inches long, containing a colorless fluid. He picked it up and asked her what she was going to do with it, and she immediately took it from him and put him out of the room. In a few minutes she came out of the room with the bottle and a cup in her hands, went to the hydrant, drank the contents of the cup and threw the bottle in the stove. She then

went back to bed and soon became unconscious. The bottle, which was then empty, was taken from the stove by Jerry and broken to pieces. Shortly after this occurred Bilik appeared at the house. This time he did not go in to see Mrs. Vrzal, and when told by Jerry that his mother must have taken poison, he said that he did not believe it and that it was too bad. Before leaving the house he told Jerry not to tell the police or doctors that he had been there, and that he would be back again at twelve o'clock that night. He was seen at the house again about 7:30 that evening, and at that time he told Mrs. Engelthaler that if the police inquired if he had been there, to say no. A doctor was called by Jerry shortly after Mrs. Vrzal drank the contents of the cup. A stomach pump was used. About two o'clock on the following morning she again became conscious, and at that time she vomited and suffered intense pain in her stomach. On that day, about noon, she died. An inquest was held, the stomach and liver removed and examined and found to contain not less than two grains of arsenic.

Bilik had on many occasions represented to Mrs. Vrzal and other members of the family that his mother, who lived in Cleveland, Ohio, was worth from $9000 to $22,000, and that upon her death he would inherit her property; that as soon as he received this he would pay to Mrs. Vrzal the money he had obtained from them. He stated to them that he would charm his mother, and led them to believe that in that way he would cause her death and get the money. He employed Anna and Mary Flynn, stenographers at the Palmer House, in Chicago, to write for him numerous letters addressed to Mrs. Vrzal, requesting money, and stating that the "job" would be finished at a certain time. The letters were ante-dated and written so as to appear to have been sent from some city other than Chicago. The word "job," as used by him in these letters, was understood by the Vrzals to mean the killing of his mother. He caused at least a part of these letters to be delivered by messenger,

and led the Vrzals to believe that the messenger in each
instance had been sent by him from the city in which the
letter appeared to have been written.   On one occasion he
went to the Vrzal home and announced that his mother was
dead, and secured from Mrs. Vrzal $150 with which to go
to Cleveland and also $7 with which to buy flowers for the
funeral.   This statement was untrue.   Some time during
the summer of 1906 Bilik received the following letter from
Mrs. Vrzal, which was found at his house after his arrest:

*"My Dearest Friend*—You wrote me that I shall be as frank
towards you as you are towards me.  Who is more frank, I or you?
You know I am.  Why?  That old woman is not worth the money.
Just as I wrote this letter I received a telegram.  What are you
thinking of?  I haven't got $10 in the whole house, and on Wed-
nesday I need $180.  I expected that you would help me out with
something.  Now I am broke.  What shall I do?  You may as well
give that old woman poison so that you can help yourself to some-
thing.  At least send me those children home.  I am sick and you
are only misleading me.  Anyhow, I can't help liking you so much,
no matter if you like me or not.  If you loved me you would have
done it long ago.  What I must suffer from people!  I greet you
and the children many times over and send you one hundred thou-
sand kisses.      "Your good and sincere lady friend,
                                        ROSIE VRZAL.
"And don't write me any more for money.  It is useless.  I can't
send as much as one dollar, because I haven't got it."

Bilik often represented to the members of the Vrzal
family that he was not on friendly terms with his wife.   In
their presence he would call her vile names and frequently
did things for the purpose of making them believe he was
not living with her.   Shortly after Vrzal's death he stated
in the presence of Mrs. Vrzal that he had obtained a di-
vorce, which was untrue.

In support of the theory of the prosecution that a con-
spiracy had existed between Bilik and Mrs. Vrzal to kill the
various members of the Vrzal family, evidence was offered
by the People tending to show that during the fore part of
the month of July, 1906, two attempts were made in one
night to kill Emma Neamann with illuminating gas while

she was sleeping at the Vrzal home, and that during the latter part of the month an attempt was made by Bilik and Mrs. Vrzal to kill Rosie, Ella and Bertha Vrzal at one time by the same means.

A young man by the name of Parkison was living at Bilik's house at the time of his arrest. On the trial he testified that on the evening of December 3, 1906, when he came home from his work, about five o'clock, Bilik told him of the account of the deaths of the members of the Vrzal family that appeared in the *Chicago American* of that date; that Bilik was very much excited and said that he was afraid; that he would leave the city before he would get mixed up in the case, and that he would rather shoot himself than get mixed up in it. On the following day, at noon, when Parkison came home for dinner, Bilik stated to him that Mrs. Vrzal had taken poison. Mrs. Armbruster, a near neighbor of Bilik's, testified that on December 4, 1906, she saw Bilik about eight o'clock in the morning; that about half-past eleven in the forenoon of that day he came up the back way and rapped on her window; that when she opened the door Bilik came in and said, "She took chloroform," and that when she asked "Who?" he replied, "Mrs. Vrzal." This was before Mrs. Vrzal had actually taken the contents of the bottle which she afterward threw in the stove but after Bilik had visited her that day.

While Bilik was pretending to charm back the recreant lover of Emma he went to San Francisco. From there he telegraphed to the Vrzals that he was working the charm and asked them to send $100. They sent $75. He returned to Chicago and took his family to San Francisco. They remained there but a short time when they went to Cleveland, Ohio, and from there a little later they returned to Chicago. Bilik testified himself, asseverated his innocence, denied many of the things alleged against him, attempted to explain others, and offered other testimony which corroborated him in some respects.

Plaintiff in error contends (1) the court erred in passing on objections to evidence; (2) the court erred in passing on the instructions; (3) the court erred in permitting the prosecuting attorney to make improper remarks in his argument to the jury.

Francis E. Hinckley, for plaintiff in error.

W. H. Stead, Attorney General, and John J. Healy, State's Attorney, (Robert N. Holt, and George M. Popham, of counsel,) for the People.

Mr. Justice Scott delivered the opinion of the court:

It is not contended by plaintiff in error (called Bilik) that the proof is such that a reversal should be had on the ground that the evidence did not warrant the verdict. It is the theory of the prosecution, and the evidence tended to prove, that the relations between the plaintiff in error and Rosie Vrzal, the wife of Martin Vrzal, were illicit; that Bilik and Mrs. Vrzal entered into a conspiracy the object of which was to destroy the lives of Martin Vrzal and of all the children of Martin and Rosie Vrzal except the son, Jerry; that in pursuance of the conspiracy Martin Vrzal and four of the children were murdered by arsenical poisoning, and that it was also agreed between Bilik and Mrs. Vrzal, as a part of the same conspiracy, that the life of Bilik's mother should be taken.

There was insurance upon the life of each member of the Vrzal family who died and against whom the conspiracy is alleged to have been aimed, and that insurance became payable to Mrs. Vrzal and was substantially all collected by her. The view of the prosecution is, that the conspirators desired to obtain the money that would be payable upon the insurance policies on the lives of the members of the Vrzal family who died, and that Mrs. Vrzal desired to add thereto the property which Bilik represented that he would suc-

ceed to upon the death of his mother. He would then obtain a divorce from his own wife, and if the various members of the Vrzal family against whom the conspiracy was aimed were out of the way, he and Mrs. Vrzal would marry, take Jerry, the son of the Vrzals, go to Europe and live there. There is no reason to believe, from the evidence contained in this record, that Bilik's mother possessed any property except a very small amount, and the conclusion to be drawn from the People's proof is that Bilik never intended to take her life, but that he proposed doing so for the purpose of inducing Mrs. Vrzal to consent to the destruction of the members of her own family so that she might obtain the money payable upon the insurance policies, which Bilik knew that he in turn could obtain from her. The theory of the defense was that Bilik was in no way responsible for the death of any person, and that Mrs. Vrzal or some other person had caused the death of Mary and the others without his knowledge or connivance; that Mrs. Vrzal committed suicide either because of her guilty conscience and dread of coming punishment or because she feared an unjust accusation. He was convicted of the murder of Mary, the first of the children to die. The prosecution was permitted to prove various circumstances occurring after the death of Mary, including the death of three of the other children. The question of the competency of the evidence which tends to show that the three other children died as a result of arsenical poisoning, for which Bilik was responsible in whole or in part, is not presented. Plaintiff in error states that if the facts be as contended by the prosecution the poisoning of Martin Vrzal and his children was legally one transaction, and he regards the evidence as to the death of each as admissible. Therefore no question in reference to the competency of that proof will be considered by us.

Plaintiff in error contends, however, that in the course of the trial various errors intervened which necessitate a

reversal of the judgment of conviction. The first ground relied upon is, that the court erred in admitting certain testimony of the boy, Jerry Vrzal, in reference to a statement made by Bilik pertaining to a prosecution against him for violating the laws of the State of New York by practicing fortune telling in that State. This alleged error has been obviated by an addition made to the transcript of the record, by leave of court, since the brief and argument of plaintiff in error was filed.

The prosecutor, without objection, interrogated Bilik, upon cross-examination, in reference to the death of a man by the name of York. It was so made to appear that while Bilik was residing in Cleveland, Ohio, Mr. York's death occurred, and his widow came to Bilik's house and told him that the insurance company did not want to pay the insurance on York's life, and she desired to ascertain from him, in his capacity as fortune teller, whether she would get the money. The prosecutor then asked whether it was not before the death of York that Bilik was able to give her this information, and Bilik denied that she saw him until the time in question, after the death of her husband. He also stated that when he was in San Francisco he saw Mrs. York there; that she was in impoverished circumstances and sought to borrow money from him, which he was unable to lend to her. The prosecutor was also permitted, without objection, to prove by Bilik, on cross-examination, that while Bilik and his wife were in San Francisco she received a telegram from her brother stating that her mother, Mrs. Cermack, had just died in Cleveland, Ohio, and pursuant to that telegram Bilik and his family went from San Francisco to Cleveland.

At the request of the prosecution the court instructed the jury that the evidence admitted which tended to show the poisoning or death of any person other than Mary Vrzal could be considered by the jury only so far as the same tended to show (1) a motive to poison Mary Vrzal and

whether Bilik was influenced thereby; (2) that the death of Mary Vrzal was not accidental, but was the result of a plan or design on the part of Bilik; and (3) whether a conspiracy existed between the defendant and Mrs. Vrzal to carry out certain unlawful plans, which included the murder of Mary Vrzal by poison. It is not urged that this instruction was erroneous in so far as it applied to evidence which was admitted showing the death of members of the Vrzal family other than Mary, but that it was erroneous for the reason, as is urged, that it authorized the jury to consider the evidence showing the death of Mr. York and the death of Mrs. Cermack, as tending to show a motive for the poisoning of Mary Vrzal, or as tending to show that her death was not accidental, or as tending to show that her death was the direct result of a plan conceived by Bilik. We think this criticism without merit. So far as Mrs. Cermack was concerned there was absolutely nothing in the proof upon which to hang any improper suspicion with reference to Bilik. As to Mr. York, while the evidence itself was improper, it was received without objection, and there is nothing in it to indicate that Bilik ever heard of Mr. York until after his death. We do not think that the jury could have regarded this instruction as one which authorized them to consider the evidence with reference to the death of Mrs. Cermack and the death of Mr. York as tending in any degree to show that Bilik caused the death of Mary Vrzal.

In the second instruction given at the request of the prosecution the court advised the jury that the instructions are simply as to the law of the case; that it is the duty of the jury to determine the facts without depending upon the opinion of either court or counsel, if any such opinion has been in any manner indicated; that it is for the court to advise the jury as to the law; "it is for counsel to argue the case as to such counsel it may seem proper," but it is for the jury to determine from the evidence what facts have been proven. It is objected that the quoted language gave

to counsel for the prosecution too much latitude. That language is not an accurate statement of the law, but it does not warrant reversal in the absence of a showing that the prosecutor made improper argument to which the court's approval was given by this instruction. It is contended that the prosecutor may have argued that Bilik was responsible for the deaths of Mr. York and Mrs. Cermack, and that the murder done in the Vrzal family was a continuance of practices theretofore entered upon by Bilik. No such argument has been preserved by the bill of exceptions and we will not presume that such statements were made. In this connection it is perhaps best to treat of questions that arose pertaining to the argument of the prosecuting attorney. He made a statement to the jury in reference to the effect of a verdict for acquittal that was improper. To that statement counsel for Bilik objected. The court sustained the objection. Thereupon the speaker withdrew the statement, and said, in substance, that he yielded to the ruling of the court. It is said that the instruction now under consideration was erroneous for the reason that it authorized the jury to consider this portion of the argument, which the court had already held to be improper. Inasmuch as the court had sustained the objection to that statement and the prosecuting attorney had withdrawn it, it seems clear that the jury would not understand that this instruction authorized them to consider it. While, as already stated, the remark in question was improper, it was immediately withdrawn upon an objection being sustained, and we do not think it was of such a character as to prejudice the cause of plaintiff in error, in view of the course pursued by the court and the prosecutor.

Instruction No. 4 given at the request of the People advised the jury that in determining the degree of credibility that should be given to the testimony of the defendant, the jury were at liberty to take into consideration the fact, if such was the fact, that he had been corroborated or con-

tradicted by credible evidence or by facts or circumstances proven on the trial. It is contended that this instruction discredited the defendant by improperly directing the attention of the jury to the fact that in many respects his testimony was without corroboration. That, we think, is a misapprehension. The instruction, as a whole, merely directs the jury to apply the ordinary tests to his testimony, such as are applicable to the testimony of any witness in determining the degree of credence to which it is entitled. The instruction, in substance, has been approved in the cases of *Hirschman* v. *People,* 101 Ill. 568, *Rider* v. *People,* 110 id. 11, and *Maguire* v. *People,* 219 id. 16.

The eighth instruction given at the request of the People is criticised for the reason that it advised the jury, among other things, that they were not at liberty to disbelieve as jurors if from the evidence they believed as men; that their oath imposed on them no obligation to doubt where no doubt would have existed if no oath had been administered. Such an instruction was held proper by this court in *Spies* v. *People,* 122 Ill. 1, and in *Watt* v. *People,* 126 id. 9, and upon the authority of those cases the objection now under consideration must be regarded as without merit. It is also objected that the instruction is involved, argumentative and misleading. The instruction is devoted to an attempt to assist the jury in understanding the term "reasonable doubt." It contains several propositions, each of which is a correct statement of the law. It is not argumentative but it is lengthy, and it is possible it would have been more easily understood by the jury had each proposition been embodied in a separate instruction. The fact that all are contained in one instruction, however, does not, in our judgment, make this particular instruction erroneous.

It is urged that the court erred in refusing instruction No. 15 and instruction No. 16 requested by plaintiff in error. Defendant in error contends, and we find upon examination of the transcript, that there was no instruction No. 16 asked

and refused. The matter which appears from plaintiff in error's brief and argument to have been included in his refused instructions Nos. 15 and 16 was, in fact, all included in his refused instruction No. 15. Counsel for plaintiff in error explains by the reply brief that at the time he prepared the brief and argument he did not have access either to the transcript or to the original refused instructions, and treated of the matter which is contained in refused instruction No. 15 as he remembered it, namely, as having been covered by two separate instructions, No. 15 and No. 16. As above indicated, however, this was a misapprehension on the part of counsel. This instruction was designed to state, in a form satisfactory to plaintiff in error, the doctrine of reasonable doubt and the rule to be applied in determining the credibility to which the testimony of the defendant was entitled. It was very lengthy, and it is properly the subject of the only criticism made of the People's instruction No. 8 to which any weight whatever could be attached. Plaintiff in error insists that if the instruction No. 8, just referred to, was proper, the rules authorizing it to be given make proper the refused instruction No. 15, now under consideration. For example, People's instruction No. 8 contained this language: "You are not at liberty to disbelieve as jurors if from the evidence you believe as men." It is said that having so instructed the jury at the request of the prosecution, the court should then have instructed the jury, at the request of the plaintiff in error, in the manner following: "You are not called upon to say on your oath that you are morally certain as jurors if you have a reasonable doubt as men." The proposition last quoted was contained in the defendant's refused instruction No. 15, and other propositions of law contained in People's No. 8 were likewise paraphrased in this instruction. The reasonable doubt which warrants an acquittal is a doubt which arises from the evidence or lack of evidence. The language above quoted from refused instruction No. 15 did not require the

reasonable doubt to arise in that manner and for that reason the instruction was properly refused. The jury were fully instructed as to the doctrine of reasonable doubt by instructions 24, 26 and 27 given to them at the request of Bilik.

We have thus disposed of all the questions presented by the brief and argument filed on behalf of the accused. The record shows no reversible error. The judgment of the criminal court will therefore be affirmed.

The clerk of this court is directed to enter an order of this court fixing the period between nine o'clock A. M. and five o'clock P. M. of the 24th day of April, A. D. 1908, as the time when the original sentence of death entered in the criminal court shall be executed. A certified copy of that order will be furnished by the clerk of this court to the sheriff of the county of Cook.　　*Judgment affirmed.*