People of the State of Illinois, Defendant in Error,
v. Robert S. Hartnett, Plaintiff in Error.

Gen. No. 49,483.

First District, Third Division.

June 11, 1964.

357

Joseph Samuels, of Chicago, for plaintiff in error.

William G. Clark, Attorney General, of Springfield (Daniel P. Ward, State's Attorney, of Chicago, Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, Elmer C. Kissane and Matthew J. Moran, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

Defendant, Robert S. Hartnett, was found guilty by a jury and sentenced by the court to a term of not less

than ten years and not more than twenty-five years for the crime of burglary, and for a term of not less than ten years and not more than fourteen years for the crime of assault with intent to commit rape, the sentences to run concurrently.

The defendant was charged in two separate indictments with the crimes of burglary and assault with intent to commit rape, which were consolidated by agreement of the parties.

He prosecutes this writ of error contending the following: (1) There was insufficient evidence to sustain the charges of assault with intent to commit rape and of burglary, and that the state did not prove defendant guilty beyond all reasonable doubt; (2) the state should have been required to elect to proceed on only one indictment; and (3) the giving of instructions numbered 8, 11 and 17 and the refusal to give defendant's instruction number 5 were erroneous and prejudicial to the defendant.

Iris Smith, age twenty-two, was asleep in a bedroom in her parents' home at 500 Melrose Street, Chicago, Illinois, at approximately 3:00 a. m. on August 4, 1961. Her two younger sisters, Karen and Ronna, occupied a second bedroom separated from Iris' bedroom by a small bathroom. Mr. and Mrs. Smith slept in a third bedroom attached to that of their younger daughters. Iris Smith had gone to sleep wearing a pajama top and a pair of pants. She awoke to observe a man, subsequently identified as Robert Hartnett, holding a butcher knife standing by the foot of her bed in front of the bathroom door. Her bedroom was illuminated by a 100-watt bulb in the adjoining bathroom. At the time of the assault the bathroom door was open. The man walked over to the bed and put the knife at her chest and ordered her to do as he said. She begged him to leave and not to hurt her. He walked a few feet away, looked out a door leading to

the kitchen and returned to the bed. She told him to put the knife away. He put the knife into his right rear pocket. The man pulled the woman's panties off and unbuttoned her pajama top. He then stood up, took the knife out of his pocket and opening his pants, took out his penis. Again he walked to the door, looked out and returned to the bed. Iris was again threatened with the knife and in response to her pleading he again put the knife in his right rear pocket. The handle of the knife was in the pocket with the blade extending above the pocket. The man then climbed on top of her, forced his way between her legs and used his hands to rub his penis against her vagina. Iris reached over his back with her right hand and pulled the knife out of his right rear pocket and plunged it into his left shoulder. She pulled the knife out immediately and as he jumped up she fell on the floor on top of the knife and started to scream. The man ran "out the kitchen door." Iris then ran to her parents' room and told them she had just killed a man. They said that it must have been a nightmare. Iris then went back to the bedroom and returned with the bloody knife.

The police were called and arrived within a few minutes. A description of the man was given to the police by Iris, which description was transmitted city-wide on police radios. Iris described her assailant to the police as being between 5'7" and 5'10" tall and weighing between 150 and 170 pounds. She is 5'5½" tall and weighs about 125 or 126 pounds.

She had a slight cut on her little finger after it was all over. A police officer wrapped up the knife and took it away. There was blood on the knife blade from the handle to the tip. The knife was 12" long.

Officer William Carroll testified that at about 4:15 a. m. the same morning he and his partner, James

Janda, went to 5930 West Lawrence Avenue in response to a call of a burglary in progress; going to the rear of the building near a garage they heard a moan and found the defendant lying face down on the sidewalk. He was wearing a white T-shirt, gray pants and blue-black oxford shoes. The man found by Officer Carroll is the defendant in this case. He told the officers that he had heard glass breaking, and, coming down to investigate, had walked to about where he was lying when something hit him. They noticed a large red stain on his left shoulder, the outer edges of which were dry. They checked his car and found the engine warm and radiator hot. His hair was neatly combed.

Officer James Janda testified that the defendant told them that he had been asleep in bed when, hearing glass break in the stairwell below the back porch of his apartment, he went down to investigate. When he reached the end of the garage by the alley he was either shot or stabbed. There was a blood stain on his left shoulder about 10″ in diameter. Blood was seeping through the hole. Lifting the T-shirt he saw a hole about ⅝ to ¾ of an inch which was located about ½″ to the right of the left shoulder blade, and about 6″ down from the collar bone or top of the shoulder blade. Other police officers arrived and after further quizzing he told them that he had been to Sears, Roebuck shopping and had arrived home about 9:30 p. m. on August 3rd; that he was in bed from 10:00 p. m. until he heard glass breaking.

Officer John O'Brien arrived at 5930 West Lawrence Avenue, pursuant to a burglary in progress call, with his partner John O'Connor. He testified that he was the one who tied defendant in with the description of a man wanted in the 38th District. He also testified that defendant's hair was neatly combed. He

361

further testified that he found a broken window in the doorway at the rear of the building.

Iris Smith identified the defendant in a lineup at about 7:00 a. m. on August 4, 1961. The defendant was taken to Northwest Hospital for his wound and from there he was hospitalized at the Bridewell Hospital.

Detective Harold P. Thompson testified that he saw the defendant on August 9, 1961 when he was being interrogated at the Sex Bureau by Assistant State's Attorney Pat Egan. The defendant then stated he had been shopping at Sears, Roebuck at Irving and Milwaukee. He left there about 9:30 p. m. and went to Sheridan Road and Irving Park where he went to several taverns. In the Avalon Tavern he met a woman at the bar and bought her a drink. They talked and she told him that she wanted to go to a bar in her neighborhood. They left and went to a tavern located about one block south of Belmont Avenue on Broadway or Clark Street. He became ill at this tavern and vomited in the washroom.

A doctor testified that he had examined the defendant on August 4, 1961 and described the wound he saw as at the angle of the scapula, overlying the third rib. That he saw a clean edged incised wound of about one inch in length. That there was a partial collapse of the left lung, and that his diagnosis was a stab wound.

Detective Walter Vallee testified that he interviewed Iris Smith and then took her to the "show-up." He conducted the "show-up." He subsequently interviewed the defendant and asked him why he had at first stated he was at home and later admitted that he was not at home, and the defendant said that he was afraid to admit that he was not at home.

The defendant testified that he resided at 5930 West Lawrence Avenue with his wife and two children,

362

ages 8 and 6; that he was Assistant Market Manager for Jewel Tea Company; that on August 4, 1961 he was on probation for burglary, having previously pleaded guilty to burglary of a store before Judge Covelli. He also testified that he initially told the police that he was at home from 10:00 p. m. on August 3, 1961, because he was on probation at the time and the truth amounted to a violation of his probation; also, that he was afraid of endangering his position at his place of employment. He denied breaking into Iris Smith's house, and denied molesting her in any way.

Iris Smith positively identified the defendant at the trial, as well as at the lineup.

■■ The defendant challenges the identification by Iris Smith and suggests that her testimony is not worthy of belief. She had ample opportunity to observe the defendant at close range. Her bedroom was illuminated by the light from a 100-watt bulb in an adjoining bathroom. She testified that she recognized Hartnett immediately upon entering the room where the lineup was held, and told her mother that he was the man. Her testimony was not shaken on cross-examination. A positive identification by one witness is sufficient for a conviction. People v. Mack, 25 Ill 2d 416, 421, 185 NE2d 154; People v. Lamphear, 6 Ill2d 346, 356, 128 NE2d 892; People v. Boney, 28 Ill2d 505, 509, 192 NE2d 920. There were some slight discrepancies in her description of the assailant as to weight and height, however, as was pointed out in the case of People v. Evans, 25 Ill2d 194, 201, 184 NE2d 836, the jury, who not only heard the testimony but saw the defendant in court, was in far better position to evaluate the weight to be given to the discrepancies in the description insofar as it pertained to the defendant's height and weight, and the court is

unable to say that the jury was required to regard the discrepancies as sufficient to create a reasonable doubt as to defendant's guilt.

The defendant's credibility was impaired by proof of a previous burglary conviction. Because of the inconsistent accounts of his activities on the morning of the assault his veracity was further questioned. Defendant claimed that he was stabbed shortly before the police arrived at the rear of his home. Dried blood stains were found on his clothing. The defendant testified that he was sleeping at the time he heard the breaking of glass at his home, but his hair was, at the time he was found, neatly combed. His statement to the police that he had driven home at 10:00 p. m. was inconsistent with the fact that the radiator of his automobile was hot at 4:30 a. m.

Due to these discrepancies and his change of stories, the jury could properly refuse to accept his unsupported testimony.

The defendant has belabored the point that the complaining witness could not have reached over and removed the knife by the blade from the defendant's right-hand pocket and then have stabbed the defendant without having cut herself more seriously. The evidence shows that she had cut her little finger in the process. The defendant's attorney also speculated as to the position the defendant would have had to be in at the time of the attempted rape, and that if he were in the position suggested by defendant's attorney the complaining witness could not have reached around the defendant to obtain the knife or to stab him. The arguments advanced in that connection do not impress us.

██ The defendant contended that Iris Smith should not be believed because of the lack of evidence of resistance to her assailant's advances. Suffice it to say that Miss Smith was threatened with death prior

to the commencement of the assault and she finally stabbed the defendant in the shoulder. This court concludes that the People sufficiently met the burden placed upon them, and that the defendant was proven guilty beyond all reasonable doubt.

■ The defendant next urges that the People were bound to elect to proceed on only one indictment. The two indictments were consolidated by agreement of the parties. One was for burglary with intent to commit rape and the other for assault with intent to commit rape. In support of this contention defendant cites the case of People v. Stingley, 414 Ill 398, 111 NE 2d 548. The court in that case said on page 401:

"The trial of criminal cases in this State proceeds according to the common law except where the mode and method are changed by statute. It is a cardinal principle of our criminal jurisprudence that a defendant cannot be tried for two separate and distinct felonies, which are wholly and totally unrelated, at the same time, and where an indictment charges two unrelated felonies raising two separate and distinct issues which are wholly unrelated, the People may be compelled, upon proper motion, to elect upon which of the two felonies charged by the indictment they will elect to prosecute. (People v. Wolf, 358 Ill 334.) On the other hand, the rule has been repeatedly stated in this State that if two or more offenses grow out of one transaction and are of such a nature that the defendant may be found guilty of each, he may be charged with the offenses in separate counts of the same indictment, and that the prosecutor will not be required to elect for which offense he will ask a conviction. An election will only be required where the offenses charged in the different counts are actually distinct from each other and do not arise out of the same transac-

365

tion. (People v. Pulliam, 352 Ill 318; People v. Bernstein, 250 Ill 63.) A defendant cannot insist that he shall not be put upon trial on an indictment containing counts charging separate felonies unless it affirmatively appears that they are not parts of one and the same transaction, but are separate and distinct in law and in fact."

The offenses in this case grew out of the one transaction and are of such a nature that the defendant may be found guilty of each.

However, it is the defendant's contention here, in relying on the Stingley case, that a conviction could be had on the burglary indictment only after intent was proven in the assault charge, and that intent was then transferred to the burglary charge, whereupon this defendant was found guilty of that crime also. In the Stingley case (414 Ill 398, 401, 111 NE2d 548) the Supreme Court citing Crespo v. U. S., 151 F 2d 44, stated that in the Crespo case the rule was laid down, "as to whether there is a plurality of offenses the test is whether, if what is set out in the second indictment had been proved under the first, there could have been a conviction; when there could, the second cannot be maintained; when there could not, it can be."

Assuming that there was a plurality of offenses in this case, defendant's rights were not prejudiced.

In People v. McMullen, 400 Ill 253, 79 NE2d 470, the defendants were charged with the crimes of burglary and larceny. Two guilty verdicts were returned, one for burglary and the other for larceny. Two judgments were entered against McMullen, one sentencing him to the penitentiary for burglary and the other for grand larceny, the terms to run concurrently. On the burglary charge he was sentenced for one year to life, and on the grand larceny charge for one to ten years. The court there held that a conviction of the

366

offense pleaded in the indictment did not permit the imposition of penalties as for separate and distinct offenses, but that the defendant's rights were not prejudiced because the two sentences were to run concurrently. In People v. Quidd, 403 Ill 15, 85 NE2d 179, the court held that where two counts of an indictment for embezzlement charged different offenses growing out of the same transaction, the effect of two guilty verdicts is the same as a verdict finding the defendant guilty as charged in the indictment and that sentences on each count to run concurrently are not prejudicial. See People v. Novotny, 371 Ill 58, 20 NE2d 34; People v. Fitzgerald, 297 Ill 264, 130 NE 720; People v. Ross, 391 Ill 164, 62 NE2d 786.

The defendant in this case was not prejudiced by the imposition of two separate sentences which are to run concurrently.

We now come to the question raised by defendant as to the three instructions which were given and the refusal to give one of defendant's instructions.

■ Instruction No. 8 dealt with defendant's testimony and the tests to be used by the jury in determining his credibility. The following language was contained in this instruction, "in determining the degree of credibility that shall be accorded to his testimony, the jury have a right to take into consideration the fact that he is interested in the results of the prosecution. . . ." The quoted language from the instruction was preceded by a charge in the instruction that one accused and on trial charged with the commission of a crime may testify in his own behalf or not, as he pleases, and that when a defendant testifies in his own behalf the jury has no right to disregard his testimony merely because he is accused of a crime; that when a defendant does so testify he becomes the same as any other witness and his credibility is to be tested by and subjected to the same tests

as are legally applied to any other witness. This same instruction was considered and approved in the case of People v. Flanagan, 338 Ill 353, 360, 170 NE 265. The court in that case relied upon the following: People v. Maciejewski, 294 Ill 390, 128 NE 489; People v. Dougherty, 266 Ill 420, 107 NE 695; People v. Zajicek, 233 Ill 198, 84 NE 249; Maguire v. People, 219 Ill 16, 76 NE 67; Rider v. People, 110 Ill 11; Hirschman v. People, 101 Ill 568. The identical instruction was also upheld in the case of People v. Becker, 340 Ill 426, 430, 172 NE 806.

The defendant cites error in the giving of instruction No. 11 insofar as it related to the tests to be used in judging the credibility of witnesses' testimony. The language objected to in that instruction is, "In judging the credibility of the witnesses in this case, you should carefully scrutinize the testimony given, and in doing so, you may consider . . . his interest if any, in the outcome of the case. . . ."

 The defendant contends that the giving of instructions Numbers 8 and 11 pointed out defendant's testimony over and above that of any other witness, because he says the defendant is the only person who has an interest in the results of the prosecution or in the outcome of the trial. The second instruction objected to did not refer to the credibility of the defendant but told the jury in effect that they could consider the interest of any witness who had testified. Defendant cites People v. Gerold, 265 Ill 448, 107 NE 165, wherein an instruction is set out on pages 483 and 484, in support of his contention that by reading Instructions 8 and 11 together too much emphasis was laid upon the interest of the defendant as distinguished from the interest of all other witnesses in the case who were presumed not to have a like interest. The instruction given in the Gerold case, after reciting the various things to be taken into consideration

by the jury in passing upon the defendant's testimony, stated, "and after applying all these tests, you then deem it unworthy of belief, you may then disregard it, except so far as it is corroborated by other credible evidence. . . ." The court there held that because the testimony of a defendant or any other witness cannot be disregarded unless he has knowingly and willfully testified falsely on material matters, the giving of that instruction was error. The court likewise stated that the wording as to the first part of the instruction was objectionable, and that it might lead the jury to treat the testimony of the defendant different from that of other witnesses. The first part of the instruction stated that "when the defendant testified in this case he differs from other witnesses only in the fact that he, the defendant, is charged and being tried for crime, which you may take into consideration in passing upon his credibility. . . ."

Instructions 8 and 11 are not subject to the same objection raised in the Gerold case. Each was a proper instruction and taken together did not operate to the prejudice of the defendant.

██ While under his Points and Authorities the defendant alleges error in the giving of instruction No. 17, he does not comment on it in his argument and it will be considered by us as having been waived.

██ Defendant further contends that the court erred in refusing to give defendant's instruction No. 5. Defendant's instruction No. 5, which was refused, was as follows: "The court instructs the jury that in order to convict the defendant upon circumstantial evidence, it is necessary not only that all the circumstances concur to show that he committed the crime charged, but that those circumstances are inconsistent with any other reasonable conclusion than that of his guilt. It is not sufficient to entitle the prosecution to a conviction that the circumstances coincide with, ac-

count for, and render probable the hypothesis of guilt sought to be established by the prosecution, but those circumstances must exclude, to all moral certainty, every other hypothesis but the single one of guilt of the defendant, or the jury must find the defendant not guilty." The defendant contends that this instruction should have been given to serve as a guide to the jury in enabling them to determine whether or not intent was proved in the burglary charge. The State was required only to prove its case beyond a reasonable doubt.

Seventeen instructions were given to the jury, at least two of them cautioning the jury that the burden was on the State to prove the charges beyond all reasonable doubt and that if the jury has a reasonable doubt the defendant should be given the benefit thereof and should be found not guilty.

We conclude that the court did not commit error in refusing to give defendant's instruction No. 5.

We find no reversible error in the record. The judgments of the Criminal Court of Cook County will therefore be affirmed.

Judgments affirmed.

SCHWARTZ, P. J. and DEMPSEY, J., concur.