**People of the State of Illinois, Defendant in Error, v. Ronald George Martin, Plaintiff in Error.**

**Gen. No. 50,063.**

First District, First Division.
September 13, 1965.
Rehearing denied October 14, 1965.

Richton & Garibaldi, of Chicago Heights (Dario A. Garibaldi, of counsel), for plaintiff in error.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and John Gannon, Assistant State's Attorneys, of counsel), for defendant in error.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

Ronald George Martin was indicted for the murder of Everett McCrea which took place at about 12:49 on the morning of April 7, 1962, in the victim's tavern in Palatine, Illinois. A jury found the defendant guilty, and after the denial of his motion in arrest of judgment and his motion for a new trial, the defendant was sentenced to imprisonment in the Illinois State Penitentiary for a term of not less than twenty-five nor more than fifty years. The Supreme Court

issued its writ of error, but subsequently transferred the case to this court.

Although he raises no questions on the pleadings, the defendant contends that the denial of his motion for a directed verdict at the close of the State's case was error because the testimony of the victim's wife and of the defendant's brother-in-law was legally insufficient to support the identification of the defendant and to sustain his conviction. The defendant also contends that the denial of his motion for a new trial was error on the following grounds: that the court allowed prejudicial testimony and argument concerning a lie detector test; that the court refused to submit an instruction on alibi; that the court excluded the defendant's only witness; that the court allowed the State in argument to comment that no one had taken the stand for the defendant; that the court refused to quiz the jury to determine whether they were influenced by reading a certain newspaper which was found in the jury room; that the court erroneously allowed opinion evidence of one witness concerning an exhibit which the court excluded from evidence; that the court erred in allowing the State in argument to comment on facts which were not in evidence; that the court refused to instruct the jury concerning the definition of "reasonable doubt"; that the court refused to allow the defense counsel to examine a notebook which a police officer was using to refresh his memory during his testimony; and that the court allowed one of the State's chief witnesses to testify concerning the defendant's alleged statements which, if believed, would amount to a confession, without having previously supplied a list of witnesses to the defendant.

The record shows that the victim, Everett McCrea, closed his tavern at about midnight on the night in question and sometime later left the tavern to ac-

206

company an intoxicated patron to a nearby cab stand. The victim's wife testified that while her husband was away, a man, who she positively identified at a coroner's inquest and at the trial as the defendant, came to the back door which was locked and asked for a six-pack of beer. Mrs. McCrea asked him to wait outside until her husband returned because he would have to decide whether to sell the beer. About 12:30 the victim returned. He and the defendant entered the tavern and while Mr. McCrea went into a back room to get the beer, the defendant sat down at the bar. After her husband brought the beer and gave it to the defendant, Mrs. McCrea walked ahead of the defendant to let him out the back door. At that point she felt something in her back and when she turned to look at the defendant she saw that he had a gun. Mr. McCrea came to his wife's aid and in the ensuing struggle she was shot in the leg. As the victim and the defendant continued to struggle, Mrs. McCrea called the police from a telephone in the tavern. While she was on the phone, the defendant, who was standing about four feet from her, and who was facing her, fired two shots which struck her in the shoulder and the wrist. Mrs. McCrea testified that she then saw the defendant fire the fatal shot into her husband's neck and run out of the tavern.

A radio operator at the Palatine Police Department testified that at about 12:49 on the morning in question he received a telephone call. He testified that he heard three shots over the phone, spoke to the telephone operator and on the basis of the telephone conversation sent police cars to the tavern. On cross-examination, the radio operator produced a radio log which contained a record of the message which the operator received. The log, which was read to the jury, contained a brief account of Mrs. McCrea's report of the incident, and a description of the person.

The Palatine police subsequently made an investigation of the occurrence and warrants were issued for the arrest of the defendant and the defendant's brother-in-law, Fred Baum. About three weeks after the shooting, the two suspects were apprehended in Portage, Wisconsin. When they were questioned by Palatine police officers and others, the defendant denied committing the crime. Baum at first denied any knowledge of the crime, but after a lie detector test made statements incriminating the defendant.

After the men were returned to Palatine, the defendant, Baum, and three other men were shown to Mrs. McCrea in a lineup outside the rear door of the tavern under circumstances similar to those which existed on the morning of the shooting. At this lineup, Mrs. McCrea stated that she could not be sure which of the men was the one who did the shooting. However, Mrs. McCrea testified that at the time of this lineup she was taking sedatives in connection with the bullet wounds she had suffered. Subsequently at the coroner's inquest and at the trial, Mrs. McCrea positively identified the defendant as the man who committed the crime.

When the defendant's twenty-one-year-old brother-in-law, Baum, was called by the State, he testified that when he was first questioned in Portage he denied having any knowledge of the shooting. Afterward, however, he said he told the police that on April 6, 1962, he and the defendant, who worked together, and who slept in the defendant's auto for the past two nights, left work about 4:45 in the afternoon, drove to the defendant's home in the defendant's Pontiac and there picked up another of the defendant's cars, an Oldsmobile. In separate cars, Baum and the defendant drove to the tavern in question, arriving there about 7:30 in the evening. Baum testified that they remained there until about 10:30. Again driving in

separate cars, they then went to the home of Bill Walters who had been in the tavern that evening. They left the Oldsmobile at Walter's home and returned to the tavern in the Pontiac about 11:00. While the defendant went into the tavern, Baum remained in the car. After a period which Baum estimated to be about two and one-half hours, the defendant returned to the car, told him he was going to get a couple of quarts of beer, pulled out a .22 caliber pistol from under the front car seat, put it inside his coat and went to the rear door of the tavern. About ten or fifteen minutes later, Baum testified that he heard three shots and saw the defendant come out of the back door of the tavern. When he got in the car, the defendant told him that "He got in a little trouble, an argument." The two drove to Walter's, left the Pontiac, picked up the Oldsmobile and subsequently drove to Milwaukee where they spent the night. The next day they met the defendant's ex-wife, purchased railroad tickets and took the train to their respective destinations. Later they returned to Milwaukee and the defendant and Baum drove back to Palatine. In the course of the next week they both on occasion went to the tavern where the shooting took place. On April 21, 1962, they again went to Wisconsin and on the following day, as they were returning home, were apprehended by the police in Portage, Wisconsin, and were subsequently returned to Palatine in police custody. Until the trial, Baum was kept in the State's Attorney's quarters.

On this appeal, the defendant contends that the trial court erred in denying his motion for a directed verdict at the end of the State's case because nowhere in the evidence was the defendant identified as the person who committed the crime by any credible witness or by any evidence which was not subsequently refuted or retracted. Primarily the defendant argues

that Mrs. McCrea's identification was faulty, insufficient and unreliable because she could not identify the defendant at the lineup outside the tavern and because when she was shown an artist's composite picture prepared from information given by patrons of the tavern she identified the picture as that of the defendant, whereas it appears that the picture resembles Baum and not the defendant.

██ We are unable to agree with the defendant's contention. Ordinarily the sufficiency of identification is a question of fact for a jury and courts of review will not reverse unless the testimony is so unsatisfactory as to leave a reasonable doubt as to the guilt of the accused. People v. Tunstall, 17 Ill2d 160, 161 NE2d 300; People v. Brengettsy, 25 Ill2d 228, 184 NE2d 849. We find no such reasonable doubt here. Mrs. McCrea had ample opportunity at the time of the shooting to see the person who committed the crime. She saw the man through the window when he first came to the back door of the tavern; she looked at him when he first stuck the gun in her back; and she testified that when she and her husband were shot, she was facing the assailant and was only four feet from him. Mrs. McCrea positively identified the defendant as the guilty person, both at the coroner's inquest and at the trial. The fact that she was unable to make an identification at the lineup outside the tavern is explained by the fact that she was under sedation at the time.

██ Since positive identification by one witness who had ample opportunity for observation is sufficient to support a conviction (People v. Mack, 25 Ill2d 416, 185 NE2d 154; People v. Hartnett, 49 Ill App2d 357, 199 NE2d 671,) it is unnecessary to consider the defendant's further contention that Baum's testimony was insufficient to sustain the defendant's conviction. We conclude that the trial court properly

210

denied the defendant's motion for a directed verdict at the end of the State's case.

The defendant further contends that the trial court erred in denying his motion for a new trial. The defendant's first argument is that the trial judge erroneously allowed prejudicial testimony and argument by counsel concerning a lie detector test taken by Baum. It appears from the record that on direct examination Baum testified that he was questioned by the police twice and that he lied at first, but told the truth the second time. In answer to a question about the length of the period between the first and second questioning, Baum answered, "it was quite a while. I took a lie detector test." The defendant's objection to the remark was overruled. On cross-examination, defendant's counsel questioned Baum, as follows:

> Q. Then they talked to you a second time, is that correct?
> A. After I took a lie detector test, yes.

At first the defendant's counsel asked that the answer be stricken, but then proceeded with the following line of questioning:

> Q. Ronald [the defendant] took a lie test, too, didn't he? Yes or no.
> A. I guess so.
> Q. You know he took a lie test, don't you, Fred?
> A. Yes.
> Q. All right. You weren't the only one who took a lie test. He volunteered to take one, too, didn't he?
> A. Yes.

In its argument the State said:

> . . . you know why he [Baum] finally told the truth, because he told you. He said he failed a lie test.

This remark was stricken on the defendant's objection that the statement was not in evidence.

It is clear in Illinois that the results of a lie detector test are inadmissible as evidence either of the guilt or innocence of the accused. People v. Zazzetta, 27 Ill2d 302, 189 NE2d 260; People v. Boney, 28 Ill2d 505, 192 NE2d 920. As the Supreme Court stated in Zazzetta at page 306, "the reason most commonly assigned for the exclusion of the results of a lie detector from evidence is the contention that the lie detector has not yet attained sufficient scientific acceptance as a reliable and accurate means of ascertaining truth or deception as to be acceptable in a court of law." We note that in the present case the only reference to the results of Baum's test was the statement made in argument. That statement was properly stricken. The only remaining statements are those of Baum. They are not statements about the results of the test, but only about the fact that he took the test. Because these latter statements do not raise any issue as to the reliability of the lie detector test, their exclusion is not justified by the rationale given in Zazzetta for excluding evidence concerning the results of a lie test. Hence, we conclude that the trial court did not err in allowing Baum's statements that he took a lie detector test to go into evidence.

Next the defendant urges that the trial court erred in refusing to give his or any other instruction on alibi. We agree with the defendant that whether or not the defendant testified or otherwise offered evidence, if there is any evidence tending to prove an alibi, the trial court should give a proper instruction on that issue. People v. Thompson, 321 Ill 594, 152 NE 516; People v. Leving, 371 Ill 448, 21 NE2d 391. However, after carefully searching the record, we fail to find any evidence tending to prove that the defendant was at another place during the time of the

commission of the crime. Hence the trial court properly refused to submit to the jury any instruction on alibi.

The defendant further argues that the trial court erroneously excluded the defendant's only witness who, it is claimed, would give evidence impeaching one of the State's chief witnesses, Baum. The record shows that at the end of a Friday afternoon session, when the court indicated that he was prepared to adjourn until the following Monday, the defendant's attorney indicated to the court that, pursuant to the court's request that the defense have some witnesses available for the day, he had a witness ready who had been brought especially from out of town. Defendant's counsel also stated that this witness was a government employee and that the witness did not know whether he could obtain a person to relieve him at work the following Monday. After stating that he was afraid that he would lose the witness who, he said, would testify as to the veracity of Baum, defendant's counsel asked that the witness be heard out of the ordinary order of trial and before Baum would testify for the State. On the State's objections, the court denied the request and adjourned the trial.

██ ██ At this point the defendant could have put the impeaching witness under subpoena or could have asked the court to instruct the witness to remain in the jurisdiction until he could be called. Nothing in the record indicates that these procedures were used to assure that the witness would be available later in the trial. At the close of the State's case, the defendant did not call the witness; he did not seek a continuance in order to secure the presence of the witness in court. And subsequently, in his motion for a new trial, the defendant did not charge error with respect to the denial of his motion to hear this witness out of the ordinary course of trial. Under all these circum-

213

stances, we can only conclude that the witness was not called because the defendant's counsel, who is a competent trial lawyer, determined not to call the witness. Hence we believe that there was no prejudice to the defendant in this respect.

The defendant's next charge of error is that in its closing argument the State was permitted to comment that no one had taken the stand in the defendant's behalf. In its argument the State said:

> Has anybody taken the stand in his [defendant's] behalf and said that Fred Baum is lying—

Defendant's counsel then objected that "the defendant doesn't have to prove anything in this case." The State continued:

> You will be instructed on that. He doesn't have to take the stand. But has anyone gotten up here and said that Fred Baum lies, that Fred Baum didn't go around that way?

Counsel for the defendant again objected, but the court denied his motion for withdrawal of a juror and declaration of a mistrial.

■■ The Illinois criminal statutes provide that the neglect of the defendant to testify shall not create any presumption against him and that the court shall not permit any reference or comment to be made on such neglect (Ill Rev Stats 1963, c 38, § 734). However, where the defendant presents no evidence, it is well established that this section does not bar comment by the State that its evidence was uncontradicted. See People v. Norman, 28 Ill2d 77, 190 NE2d 819 and cases there cited. We conclude that the court was not in error in permitting the State to call attention to the fact that Baum's testimony was uncontradicted.

■ The last of the defendant's contentions which we will consider at length is that the trial court com-

mitted reversible error in refusing to quiz the jury concerning whether or not they had been influenced by reading a newspaper which was found in the jury room and which contained lurid stories and photographs of homicides and other violent crimes. The record reveals that at the conclusion of the first day of trial the defendant was informed of his right to have the jury locked up and that he voluntarily waived that right. The court then admonished the jury that "if anything should appear in the press or on other media of communication, you should put it aside and not hear it and not read it." On the following day of trial, a copy of the newspaper, the National Inquirer, was found in the jury room or on the jury table. The defendant's counsel stated to the court that the paper contained "lurid pictures" and "many, many articles pertaining to homicides." Defendant's counsel admitted, however, that the paper contained no reference to the case then being tried. The defendant requested that the judge inquire of the jurors whether anything they had read in the newspaper would influence their decision. The state did not object. However, after perusing the paper and hearing the testimony of the bailiff who found the paper, the court denied the defendant's request. We find no error in the trial court's action. Especially considering the fact that the newspaper contained no reference to the case then on trial, we do not believe that the court abused its discretion in refusing to quiz the jury with reference to the paper. The cases cited by the defendant are not controlling. Unlike the present case, the possibility of prejudice was clear in those cases because they involved newspaper accounts of or directly relating to the case on trial.

We have considered the defendant's remaining claims of error: that the court allowed opinion evidence of one witness concerning an exhibit which the

court excluded from evidence; that the court erred in allowing the State in argument to comment on facts which were not in evidence; that the court refused to instruct the jury concerning the definition of "reasonable doubt"; that the court refused to allow the defense counsel to examine a certain notebook which a police officer was using to refresh his memory; and that the court allowed Baum, one of the State's chief witnesses to testify concerning the defendant's statements which, if believed, would amount to a confession, without having previously supplied a list of witnesses to the defendant. After a careful consideration of the record and the briefs, we have concluded that these allegations of error are without merit and do not require reversal.

In our opinion, the defendant received a fair trial. Hence the judgment should be affirmed.

Judgment affirmed.

MURPHY and KLUCZYNSKI, JJ., concur.