2022 IL App (1st) 192520-U

No. 1-19-2520

Second Division
March 1, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 18 CR 238101 |
| v. | ) | |
| | ) | |
| MICHAEL PELKO, | ) | Honorable |
| | ) | Thomas J. Byrne |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt of first degree murder. The trial court did not err in allowing certain testimony from the State's expert witness or in refusing to give defendant's proffered alibi instruction to the jury.

¶ 2    Following a jury trial, defendant-appellant Michael Pelko was found guilty of first degree murder and was sentenced to a total of 55 years' imprisonment, which included a mandatory 25-year sentencing enhancement for the use of a firearm. Defendant now appeals from that judgment,

arguing that (1) the evidence was insufficient to find him guilty beyond a reasonable doubt of committing first degree murder; (2) the trial court committed plain error in allowing the State to elicit testimony from Dr. Michael Eckhardt due to the State's late disclosure of expert materials; and (3) the trial court abused its discretion in refusing to tender defendant's proffered nonpattern alibi jury instruction. For the following reasons, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4                                A. Trial Evidence

¶ 5      Defendant was charged with first degree murder in the shooting of Izat Morrar, who was found dead in an alley near 5319 South Calumet Avenue on July 20, 2017. The case proceeded to a jury trial on August 19, 2019. The evidence included extensive testimony from numerous witnesses and exhibits. We recount the evidence presented at trial only to the extent necessary to resolve the issues on appeal.

¶ 6                              1. State's Evidence

¶ 7                          a. Crime Scene Investigation

¶ 8      Chicago police detective Roger Murphy testified that on July 20, 2017, he was assigned to investigate Morrar's death pursuant to a 911 call placed at approximately 3:50 p.m. At the scene, Detective Murphy observed Morrar face down on the ground with two gunshot wounds to his head. Morrar did not have any property on his body other than a pair of headphones.

¶ 9      Detective Murphy later searched Morrar's office, which revealed a cell phone, laptop computer, a small notebook that appeared to be a ledger, and a shoebox containing $27,800 in cash. Detective Murphy also interviewed several of Morrar's family members, which led him to believe that Morrar may have had contact with defendant prior to his death. Morrar's cell phone records showed that the last phone call was with a phone number associated with defendant.

¶ 10 On July 23, 2017, Detective Murphy interviewed defendant at the police station. Defendant stated that he had known Morrar for several years and that the two were "best friends." Defendant worked at the Chicago Board of Trade and Morrar worked at a nearby building. The last time defendant saw Morrar was around 2 p.m. on July 20, 2017, when they smoked a cigarette together near their workplaces. After that, defendant went to the parking garage to retrieve his Hyundai Santa Fe and drove to his house in Willow Springs, Illinois. Defendant told Detective Murphy that he did not know who could have murdered Morrar but that Morrar was a drug user, met women online, and used to sell drugs. Defendant admitted that he used to sell marijuana for Morrar.

¶ 11                                    b. Search of Defendant's House and Vehicle

¶ 12 After viewing the surveillance footage from the area around the crime scene (discussed in greater detail below), Detective Murphy obtained search warrants for defendant's vehicle, house, and cell phone.

¶ 13 The warrant for defendant's home was executed on July 27, 2017. The police recovered a total of 18 firearms from defendant's home, 10 of which were sent for testing. The police also recovered 425 grams of marijuana, which was found in the ceiling of the laundry room.

¶ 14 Chicago police officer Brian Smith, a forensic investigator, testified that he inspected defendant's Santa Fe pursuant to a search warrant. He observed red stains, suspected to be blood, on the headliner, the storage area, the roof light, the front passenger seat, and the front passenger door. After removing a leather seat cover from the front passenger seat, Officer Smith also observed more red stains on the seat cushion and seat back. These areas of the vehicle were removed for forensic testing. Photos of the interior of the vehicle were submitted to the jury.

¶ 15 The vehicle was also processed for fingerprints, which yielded suitable prints: (1) on the interior of the rear passenger door window; (2) on the exterior of the vehicle near the rear passenger

door; (3) on the exterior of the front passenger door handle; and (4) on the exterior of the front driver door underneath the handle. Officer Smith could not determine how long the fingerprints on the vehicle had been there. On cross-examination, Officer Smith confirmed that there were items, papers, and cigarette butts on the floor of the passenger side of the vehicle on the day it was inspected.

¶ 16    Lisa Fallara, a forensic scientist with the Illinois State Police Crime Lab, received the front passenger seat upper foam cushion taken from defendant's vehicle and determined through DNA analysis that the cushion was stained with blood that matched Morrar's blood card. Fallara did not receive any DNA swabs. She did receive the front passenger seat lower foam cushion, but it was not tested.

¶ 17    Emily Kuppinger, an Illinois State Police fingerprint analyst conducted a comparison and analysis for four latent prints lifted from the Santa Fe and from a fingerprint card for defendant. She found two of the prints to be suitable for comparison to the card. One was from the exterior of the front passenger door, which she determined was consistent with defendant's fingerprint. On cross-examination, she testified that she did not know when the fingerprints were placed on the surface of the vehicle.

¶ 18                                    c. Evidence of the Victim

¶ 19    Melanie Cruz, Morrar's girlfriend, testified that, she called Morrar at 1:40 p.m. and 1:45 p.m. on the day of the murder and that both calls went directly to voicemail. At 2:01 p.m., Cruz checked Morrar's location, as they shared their locations via their phones, and it showed that his location was unavailable. She did not see or hear from Morrar for the rest of that day. She contacted Morrar's brother, Ismial, who lived in California, and he flew to Chicago. On July 22, 2017, Morrar's body was identified.

¶ 20    Dr. Eckhardt, an assistant Cook County Medical Examiner, testified that he examined Morrar's body on July 21, 2017. Dr. Eckhardt opined that Morrar's death was a homicide caused by multiple gunshot wounds to the head. Morrar had two gunshot wounds to the head, and a metal projectile was removed from each wound. One of the wounds showed muzzle imprints from the gun used to fire the bullet. The toxicology report showed no drugs in Morrar's system.

¶ 21    Dr. Eckhardt also observed the presence of lividity, which is the post-mortem pooling of blood that occurs when a body is against a surface and the blood pools with gravity towards the surface that it is against. He further testified that this fixed lividity occurs between one to two hours after death, meaning it will not shift after that point. The State sought to admit photographs of Morrar's torso and back, showing fixed lividity, and his wrinkled bloody shirt, as well as photographs of defendant's car seat and asked whether Dr. Eckhardt could form opinions based on his review of those photographs. Dr. Eckhardt responded: "Based on the patterning of what I see here, yes."

¶ 22    At that time, the defense objected, and a sidebar was called. Outside the presence of the jury, defense counsel objected to Dr. Eckhardt providing an opinion that the pattern of lividity on Morrar's  body matched the pattern of the passenger seat cushion because he was not qualified to offer such an opinion and because that opinion had not been disclosed previously in Dr. Eckhardt's report. The trial court allowed defense counsel to interview Dr. Eckhardt. After doing so, defense counsel reiterated that the objection was only to testimony "regarding anything from the seat compared to the blood stain on the shirt" such as that the "dotting patterning on the blood stain on the back of the shirt *** appears to be consistent with the pattern that is on the seat that [the doctor] looked at." The trial court agreed that such testimony would be outside of the doctor's expertise. Regarding the body's fixed lividity being consistent with sitting upright in a seat, the trial court

ruled that the doctor could testify to anything relevant to the body's lividity, if it was consistent with being in that seat and bleeding after being shot. The State agreed that it would not question the doctor on the patterning of the seat.

¶ 23 Once testimony resumed, Dr. Eckhardt opined that the lividity, on Morrar's body indicated that he was either laying on his back or against some surface. He confirmed that the lividity observed on the victim was consistent with being in a seated position with his back against a surface.

¶ 24                                    d. Surveillance Evidence

¶ 25 The State also introduced surveillance footage of the day of the murder collected from Edmond Burke Elementary School, Chicago Police Department pod cameras, a parking garage, and a Chicago Transit Authority bus.[1]

¶ 26 The parking garage footage shows that at approximately 1:30 p.m., defendant enters his Santa Fe and leaves the parking garage. Defendant is wearing a baseball hat, blue jeans, and a white T-shirt beneath a button-down collared shirt.

¶ 27 The footage from the exterior of the Chicago Board of Trade building shows Morrar standing outside wearing a white, collared shirt with short sleeves at 1:35 p.m. When defendant's Santa Fe pulls up, Morrar places a backpack into the backseat of defendant's Santa Fe and enters the front passenger seat.

¶ 28 Camera footage from the bus shows defendant's Santa Fe on Martin Luther King Drive at 3:46 p.m. From this footage, the police were able to identify the license plate, which matched defendant's Santa Fe. Similarly, surveillance footage from the pod camera shows the Santa Fe

---

[1] The introduction of each of these videos was stipulated to by the parties.

turning onto Calumet Avenue at 3:47 p.m. In the video, the driver is wearing a white t-shirt. The footage from the elementary school shows the Santa Fe stopping in the alley between 51st Street and Calumet, where Morrar's body was found. Though the camera is some distance away, it is clear that a person in a white shirt exited the driver's side and walked over to the front passenger's door. Soon after, the driver gets back into the driver's seat and the Santa Fe exits the alley.

¶ 29                                     f. Firearms Evidence

¶ 30    Joan Bunte testified that she was employed with Bunte Auction Services, which is an auction house that sells a variety of items. Her records showed that defendant purchased four firearms in April 2008: a .22-caliber revolver, a .32-caliber handgun, and two .22-caliber rifles. Detective Murphy received this same documentation and confirmed that three of the four guns purchased then were found in the house. The one that was not located was the .22-caliber revolver.

¶ 31    Cari Nudera testified that she was employed by the Illinois State Police as a forensic scientist, and she was qualified as an expert in firearms identification. She determined that one of the bullet fragments recovered from Morrar's body, were .22-caliber bullets but she could not determine if they were fired from the same firearm. Nudera also received four firearms for testing, some of which were semi-automatic and some revolvers. She determined that none of those firearms could have fired the .22-caliber bullet and bullet fragment. She later received six additional firearms, five of which were .22-caliber rifles. She was able to exclude four out of the five rifles. The remaining one was a Ruger .22-caliber rifle, which she determined was inconclusive as to whether it fired the .22-caliber bullet and bullet fragment. She also determined that the shotgun was not capable of firing those bullets. On cross-examination, she confirmed that .22-caliber bullets could be fired from either a handgun or a rifle.

¶ 32                                     g. Cell Phone Evidence

¶ 33     The parties stipulated to the introduction of the Sprint cellular phone records for Morrar, defendant, defendant's wife, Shawna Pelko (Shawna), and defendant's son, Michael Pelko, Jr. (Michael Jr.).

¶ 34     Subsequently, the State called Fabiola Mejia, who previously worked at the Chicago Regional Computer Forensics Laboratory, which conducts digital examinations for state, local, and federal law enforcement agencies. Based on a series of searches of defendant's cell phone, she created an extraction report concerning the phone calls made from July 20 to July 28, 2017, and an extraction report concerning the text messages contained on the phone from July 19 to July 21, 2017.

¶ 35     The call log report showed that there were five phone calls between defendant and Morrar between 12:09 p.m. and 1:35 p.m. on the day of the murder. At 2:17 p.m., an outgoing call to Shawna Pelko was made lasting 3 minutes and 21 seconds. Five incoming calls came from Michael Jr.'s phone between 2:46 and 3:13 p.m. Four of those five calls were denoted as missed calls. Mejia testified that the call log report cannot distinguish between connected calls that involve conversation and those that merely connect to voicemail to leave a message. At 3:48 p.m., an incoming call from Christian Faber occurred lasting 34 seconds. This was followed by an outgoing call to Faber at 4:53 p.m. lasting 57 seconds. Finally, at 5:22 p.m., there is another outgoing call to Shawna lasting 58 seconds.

¶ 36     The text message report showed the following relevant text messages on defendant's phone. At 12:46 p.m., defendant sent a text message to Morrar stating, "I will probably split like 1:30 to beat traffic." The next outgoing text message was sent at 6:52 p.m. At 3:36 p.m., defendant received a text message from Shawna, which stated "Call BOA at 800-692-1564 about the Bank of America CC and tell them you authorized me to talk to them about the account, please." Shawna

sent another text message to defendant at 6:51 p.m., which stated "Where are you? I wanted to get a card." Defendant responded to that text message at 6:52 p.m., stating "Five minutes." Later that evening, defendant sent two text messages to Morrar, one at 8:07 p.m. and one at 8:16 p.m. The first stated, "You underground. Your bro just called me." The second stated, "Dude call your bro."

¶ 37    In reviewing another report, Mejia testified that there were no outgoing calls, text messages, or e-mails sent from defendant's phone from 2:30 p.m. to 4:50 p.m. on the day of the murder. Mejia further testified that defendant and Morrar frequently communicated with each other via text message.

¶ 38    A report was also generated extracting all text messages between defendant and Morrar, beginning with June 22, 2017. The text conversation from June 22, 2017, reads, in pertinent part:

> "Morrar: You about ready
>
> Morrar: I'm outside as we text hbu [how about you]?
>
> Morrar: Dude why aren't you answering your phone
>
> Morrar: Call me
>
> Defendant: I'm driving
>
> Morrar: Yo
>
> Morrar: Wya [where you at]?
>
> Morrar: Call when you get to your garage…I'm nearby
>
> Morrar: Ok, done waiting
>
> Defendant: I need to watch my tone? I'm racing around with your problem, half of it is not mine. What's the watch your tone? I had a heart rithmia [*sic*] last night went to doc this AM. See you outside at 4. You can tell me all about my tone.

> Morrar: You probably shouldn't be partying like you do. Yeah we'll talk tone when I see you. Look forward to it. If you blow me off today, consider yourself officially
>
> Morrar: fallen from grace in my book. I mean that.
>
> Defendant: Again, I have called and chased you all over this town. I do have my own shit. Fall from Grace? My man! How many times have I asked. Yo stop at my place? Meet me Now? Not on my terms. Only yours. And now it's tone and grace."

The conversation continues in this manner with Morrar waiting for defendant to finish up work. They continue arguing about defendant failing to meet up with Morrar and making Morrar wait for him. A similar conversation occurs the following day, while they are both at their respective offices and Morrar is trying to schedule a meeting time with defendant before he leaves downtown Chicago. At some point, defendant messages Morrar that he is at McDonald's and Morrar responds that he will be waiting at the parking garage. After more than an hour, Morrar messages defendant: "You are a real piece of work man…I was standing there by the garage for over an hour. *** This changes our relationship[.]" Defendant responds an hour later: "Now I see your texts. Should fear for my and my family's safety I reckon that means I should put the appropriate safety measures in place? How quick the tied [*sic*] turns man[.]" Morrar responds: "Please *** Enough with the bullshit cryptic texts[.]" Between June 28th and July 20th, Morrar and defendant continued to converse over text messages about meeting up and work but the text messages no longer seemed contentious.

¶ 39 On July 20, 2017, defendant messaged Morrar at 9:26 a.m. to meet up for a smoke break. Later, defendant messaged Morrar to ask about a conversation Morrar had with a business associate. At 12:46 p.m., defendant messaged Morrar stating: "I'll prob split like 130 to beat traffic."

¶ 40    Defendant's next text message to Morrar was at 12:48 p.m. on July 21, 2017, which reads: "Lookin to split 1->130 range, smoke break?" He then sent Morrar three more messages around 8 p.m. that evening, which state: "Hey", "You underground? Your bro just called me. U need to call him or text.", and "Dude! Call your bro[.]"

¶ 41    Mejia testified that she also used a forensic tool called Final Mobile, which allowed her to look into the applications ("apps") installed on defendant's phone. Mejia testified that on July 1, 2017, defendant downloaded an app called Tablet Remote, which allows the user to remote into another tablet or phone via Bluetooth. On July 2, 2017, an app called TeamViewer was downloaded to defendant's phone. TeamViewer is another app that allows you to access another device remotely via the Internet as long as the other device also has the TeamViewer app downloaded. Essentially, the difference between the two apps is that Tablet Remote requires a Bluetooth connection whereas TeamViewer can be used over the Internet. Also downloaded to defendant's phone on July 1, 2017, was an app called Google Wi-Fi, which allows you to set the Google Wi-Fi settings in your household.

¶ 42    On cross-examination, defense counsel questioned Mejia about whether these apps that were recently downloaded had been used. She stated that the Final Mobile report recorded application usage as part of the extraction process and she did not recall any application usage for Tablet Remote, TeamViewer, or Google Wi-Fi. She testified that the tool used for extraction does not show what was done in the apps, only whether they were used. She agreed that Bluetooth devices 45 minutes' drive away from each other would not be able to connect. She confirmed that the Google Wi-Fi app does not "bring Wi-Fi to wherever you are[,]" it just controls the Wi-Fi somewhere else. She admitted that she did not know how the TeamViewer app worked. She testified that, as far as what the extraction tool could tell, none of the three apps were used during

the time period of 9 a.m. and 6 p.m. on July 20, 2017. The report showed that during the time period of 2:30 p.m. to 4:00 p.m., about 30 apps were accessed, including WhatsApp conversations. She confirmed that there could have been more apps accessed during that time period that the tool she was using was not able to see.

¶ 43     Defense counsel further inquired into the call log and how the tool determined whether a call was missed, answered, or sent to voicemail. Mejia responded that she did not know "how the tool interprets whether or not [an incoming call is] going to voicemail." She further stated that she does not know how the tool was designed "to determine whether or not if it goes to voicemail versus when it's missed." In regard to the five second incoming phone call from Michael Jr., she stated that the call "could have gone through" or "could have went to voicemail." She confirmed that the 3:48 p.m. call from Faber was an incoming call, was not marked as missed on the report, and was 34 seconds long.

¶ 44     On redirect examination, Mejia testified that some apps may have background activity, meaning that the app is constantly refreshing or updating, such as the weather app. This does not mean manual interaction with the phone by the user. She further confirmed that many new apps are released almost daily. She confirmed that the forensic tools she has at her disposal have limitations and may not be a complete reproduction of everything that was in fact used by the phone during a time period.

¶ 45     On recross-examination, she testified that although her tool did not show any app usage for TeamViewer, she could not say whether it was because her tool did not recognize that app or because the app was not used.

¶ 46     FBI Special Agent Joseph Raschke testified as an expert in historical cell site analysis, which involves analyzing cellular data from the telephone company regarding phone calls. He

testified that he completed an analysis for this homicide investigation. Specifically, he analyzed the historical cell site records for the phones belonging to defendant, Shawna, and Michael Jr.

¶ 47    He testified that an incoming phone call on Morrar's phone at 1:35 p.m. on July 20, 2017, utilized a cell tower near the Financial District in downtown Chicago. He further testified that the cell phone records for Morrar's phone indicated several incoming calls that were not able to connect to the phone, which indicates that the phone is off, the battery died, or the phone is otherwise not connected to the network.

¶ 48    In analyzing Michael Jr.'s cell phone data, Raschke found that 14 calls were made between 12:30 p.m. and 5:51 p.m. while in the general vicinity of the family's Willow Springs home, though he could not say that the calls were made at a specific address. Five of those phone calls were outgoing to defendant's phone between 2:46 p.m. and 3:13 p.m. Raschke testified that three out of the five calls went directly to defendant's voicemail. On cross-examination, he stated that there was no indication that the other two calls went to voicemail but that they did not connect to the phone.

¶ 49    For Shawna's cell phone, he found that 13 phone calls between 12:34 p.m. and 5:51 p.m. utilized the same tower near the Willow Springs home. Between 5:51 p.m. and 6:37 p.m., the cell phone activity was consistent with traveling from the Willow Springs area to an area near Westmont, in the vicinity of the restaurant where Michael Jr.'s little league team was having a pizza party.

¶ 50    Finally, in looking at defendant's cell phone activity, he testified that calls made from defendant's phone between 12:09 p.m. and 1:35 p.m. occurred in the vicinity of the Financial District of downtown Chicago. A call is then made at 2:01 p.m. utilizing a cell phone tower off of Interstate 55, which is consistent with the cell phone moving southwest in the direction of Willow

Springs. Another phone call occurs at 2:17 p.m. further southwest along Interstate 55. At 2:46 p.m., a call occurs utilizing the same tower as Shawna and Michael's phones in the vicinity of the Willow Springs home. A 3:48 p.m. incoming phone call with a duration of 34 seconds was also consistent with the phone being in the vicinity of the Willow Springs home. Raschke testified that as to that phone call he could not say definitively whether the 34 seconds is talk time or that a conversation took place. He further testified on cross-examination that the 34 seconds is the "call setup time that's going on behind the scene[s] within the network and the ring time[.]" An outgoing call at 4:53 p.m. with a duration of 57 seconds was also consistent with defendant's phone being in the vicinity of the Willow Springs home. Next, there was an outgoing call to Shawna's phone at 5:22 p.m. with a duration of 59 seconds. The activity from both phones indicated that they were in the vicinity of Willow Springs when that call was made. This was followed by an incoming call from Shawna to defendant's phone at 6:37 p.m. The activity from Shawna's phone indicated that the call was made from the vicinity of the pizza restaurant, whereas defendant's phone activity indicated that the call was made from the vicinity of Willow Springs. There was no duration listed for that phone call. One minute later there was an outgoing call from defendant's phone to Shawna's with the same locations as the previous phone call. Raschke testified that the earliest time that defendant's phone activity shows being in the vicinity of the pizza restaurant is 7:13 p.m. Raschke further testified that there was no outgoing activity from defendant's phone between 2:30 p.m. and 4:50 p.m.; there was routing of incoming calls to the voicemail system but no indication of the phone "actually being picked up and dialed."

¶ 51     On cross-examination, Raschke confirmed that, even if two phones are utilizing the same cell phone tower, that does not mean that those two individuals are next to each other. Rather, they could be a few houses away or on different parts of the same property.

¶ 52                    h. Additional Testimony (State's Witnesses)

¶ 53    James Stachowiak testified that he was the baseball coach for defendant's son, Michael Pelko, Jr., during the summer of 2017. He stated that there was a pizza party for the team on the night of July 20, 2017, which was scheduled to begin at 6 p.m. at Papa Passero's on 63rd Street and Cass Avenue in Westmont, Illinois. He testified that Michael Jr., Shawna, and defendant arrived a little after 6 p.m. He did not see in what vehicle they arrived. There were around 40 people at the party. Around 7 p.m., defendant informed Stachowiak that they were leaving as he had to be at work early the next morning. The family left around 7:10 or 7:15 p.m. Stachowiak stated that the party would usually last about two or two and a half hours and the awards ceremony was to start at 7:30 p.m.

¶ 54    Sergeant Jack DeDore testified that when working on this homicide investigation, he was assigned to measure the time it took to drive from the alley where Morrar's body was found to defendant's home in Willow Springs. He conducted the trip two separate times, both on Thursdays, but with slightly different routes. The first trip took 63 minutes and the second trip took 75 minutes. On Thursday, July 19, 2018, he left defendant's home at 2:45 p.m. and arrived where Morrar's body was recovered at 3:29 p.m. He confirmed that it would be impossible to be at crime scene at 3:46 p.m. and be back in Willow Springs at 3:48 p.m.

¶ 55                              4. Defense Witnesses

¶ 56    At the close of the State's case-in-chief, defendant moved for a judgment of acquittal. The court denied the motion, and the defense presented its evidence as follows.

¶ 57                              a. Defendant's Testimony

¶ 58    Defendant testified that he began working as a broker/trader for TJM Institutional Services in 2013. His office was located at the Chicago Board of Trade. Faber began working for him in

2015. In 2017, the family had four chickens in their chicken coop at their Willow Springs home and defendant took care of them. Typically, defendant would leave for work at 6 a.m. and return home between 2:30 and 4:30 p.m. He parked his Santa Fe in a parking garage on Financial and Congress, where he would leave his keys with the attendant.

¶ 59    Defendant testified that he had known Morrar since they were children. Morrar's office was about a five minute walk from the Chicago Board of Trade. Defendant would smoke a cigarette with Morrar almost every day. In 2017, he also saw Morrar on the weekends occasionally, and they would text regularly throughout the work week.

¶ 60    In 2017, defendant had about 15 guns, which he had acquired over a long period of time. In particular, he stated that he had a fascination with .22 caliber rifles. He testified that he bought four guns at an auction in 2008 on an "as is" basis and that two of the guns, a .22-caliber handgun and a shotgun, did not work. He sold the shotgun to a dealer for parts and traded the handgun for a rifle.

¶ 61    He testified that he bought marijuana from Morrar, who received it from his brother, Ismial, in California. He would buy a pound of marijuana from Morrar once per year. He also sold some of his marijuana to neighbors, friends, and co-workers. Defendant explained that he received a pound of marijuana from Morrar in late 2016, but only paid Morrar for half of it because he only wanted half a pound and Morrar would only sell in pounds. He and Morrar had conversations about the money he owed Morrar, and in 2017, defendant arranged to give half of the marijuana back to Morrar. However, Morrar refused to take it back, and they were not able to arrange a meeting.

¶ 62    Defendant testified as to the following sequence of events on July 20, 2017. He drove his Santa Fe to work and arrived there around 6:30 a.m. At 9:26 a.m., he texted Morrar stating that he was having a smoke, and Morrar responded that he was coming. They met at LaSalle Street and

Van Buren Street and smoked a cigarette together. Later, he texted Morrar asking if he had talked to Jim, an individual that he was trying to introduce to Morrar for work-related purposes. Morrar responded, "Nice guy." At some point, defendant had a conversation with Morrar about Morrar borrowing defendant's car. Defendant was not aware of why Morrar did not have his own car that day.

¶ 63    Defendant then texted Morrar that he was leaving work around 1:30 p.m. to beat traffic. He picked up his car from the parking garage and picked up Morrar, who was carrying a backpack containing marijuana. They then drove to pick up Morrar's friend, Eric McDaniel, from Wells Street and Adams Street. Both defendant and Morrar knew McDaniel from their childhood, though Morrar knew him better. McDaniel was wearing dark shorts and a white, collared polo shirt. Defendant drove to his house in Willow Springs, arriving around 2:30 p.m. Morrar moved into the driver's seat and McDaniel moved into the front passenger seat. Defendant believed that they were driving to sell the marijuana to Richard Nagle, McDaniel's uncle.

¶ 64    At home, defendant put feed in the bird feeder and tended to the chickens, which took about an hour. His phone rang several times while he was out in the backyard but he did not answer every call. He informed his son on one of the phone calls that if he needed him, to come to the backyard. During this time, he also received a phone call from Faber at 3:48 p.m. He spoke with Faber about an order they were working on and he told Faber to cancel the order when the market closed at 4 p.m. He then went to sit on the front porch for about half an hour. He also bought some lemonade from his son. At 4:48 p.m., he spoke with Faber on the phone again about the same order and instructed Faber to have the order ready in case the client requested it while defendant was at the pizza party.

¶ 65     The family left in Shawna's Acura MDX to go to the pizza party around 5:30 p.m. and arrived at the restaurant around 6 p.m. However, defendant left at some point to go get his tablet in case the client reached out because he could not conduct the trade on his phone. He returned to the restaurant around 6:30 p.m. They stayed another 40 minutes and left before the awards ceremony because he received an order request from a client. Defendant's Santa Fe was in the driveway when he returned home and the keys were on the dashboard.

¶ 66     The next morning, he went to work as usual. Defendant testified that when he drove to work on July 21, 2017, his car was dirty and disheveled but he did not see any blood or any signs of a struggle. He sent multiple text messages to Morrar that day, but Morrar never responded. Ismial called defendant on July 21 and asked when he had last seen Morrar. Defendant informed Ismial that he had seen him at 4 p.m. and Morrar "was about to go do a drug deal." Defendant continued attempting to contact Morrar via text messages and phone calls but received no response. On July 22, 2017, about 10:30 p.m., Ismial called defendant and informed him that Morrar had been murdered. Ismial did not give him any details. Defendant was shocked and he called Faber to vent.

¶ 67     Defendant then testified as to the apps on his cell phone and for what purpose they were accessed. First, defendant used the WhatsApp messaging app to communicate with international clients almost every day. Second, he used the Tablet Remote app to access media in his house, in particular to stream media from the computer to the televisions. Third, he addressed the TeamViewer app, which he used to control the computers in his house remotely. He testified that he never used the app to access one cell phone from another cell phone and he was not sure if the app had that capability. He testified that both apps used Bluetooth and the apps would not work if they were more than a block away from the devices. As to Google Wi-Fi, defendant testified that

it was a Wi-Fi system set up in his home and he used the app to control his children's access to the internet. Finally, he testified that he had the ability to trade through his phone on the Bloomberg app, which required a fingerprint and a password for access.

¶ 68    Defendant was then shown a picture of himself in his car leaving the parking garage on July 20 and another picture of his car later that afternoon. He stated that the driver in the latter picture was not him but was McDaniel. He testified that he was "a little bit afraid" of McDaniel and described him as a "loose cannon." On July 22, 2017, Nagle, sent text messages to defendant regarding violence and defendant blocked Nagle's phone number. Soon after Morrar's death, defendant installed a security system at the home with multiple cameras. Also, defendant's mental state began to decline and he lost a lot of weight. He was abusing Vicodin and Xanax and his family staged an intervention for him, resulting in him starting an outpatient rehabilitation program.

¶ 69    In regard to defendant's conversation with Detective Murphy on July 26, 2017, defendant admitted that he did not tell Detective Murphy the truth about his whereabouts on July 20 because he was afraid of McDaniel and Nagle.

¶ 70    On cross-examination, defendant testified that he was not concerned with his friend using his car for a drug deal. Defendant was not informed of how long they would need his car and he did not ask. Defendant testified that he did tell Shawna that Morrar had borrowed his car and that Michael Jr. and his friend saw Morrar when he was dropped off at his house. When Ismial called him the next day, he did not inform him that Morrar had borrowed his car or that Morrar had left his home with McDaniel on the previous day. Defendant stated that he did not want to be involved with the drug deals. When confronted with the fact that defendant did not tell Detective Murphy about McDaniel, he responded that he "hoped that they would figure out who [McDaniel] was and

who he was with that day." He also did not inform the police about Nagle. The second time he was brought to the police station, he was under arrest and he continued to lie to the police. He admitted that on July 27, 2017, when he was again interviewed by Detective Murphy, he maintained that Morrar did not get into his car that day. Even after Detective Murphy informed defendant that they had defendant's car on video, he continued to claim that his car had been in his driveway all afternoon and he did not tell Detective Murphy that anyone had borrowed his car.

¶ 71    After defendant was arrested on January 16, 2018, he spoke with the detectives again and continued to assert that his car was in his driveway the entire afternoon, despite the detectives showing him the evidence against him. On March 21, 2018, defendant spoke with his wife on a recorded phone call, which was played for the jury. In the recording, he continued to assert to his wife that no one had used his car. On March 23, 2018, he spoke to his wife again on a recorded call. In the call, defendant tells his wife that he and Morrar had switched cars. When questioned, defendant testified that in that recorded call, he was referring to a different day, not July 20, 2017. He also confirmed that on the March 23 recorded call with his wife, he informed her that he left the pizza party early to get his car because Morrar and McDaniel had dropped off his car and left in McDaniel's brother's car.

¶ 72    He also testified that the reason he no longer was afraid of McDaniel was because his wife and children had moved into a new residence following his divorce. Finally, he initially denied owing Morrar any money for the marijuana he received from him but later stated, "When I bought the last amount of marijuana from him, I had paid him half of what I had bought." He then admitted that he owed Morrar $1,100 for the other half of the marijuana, and Morrar had been trying to collect the money owed to him.

¶ 73                              b. Joseph Sierra

¶ 74    Joseph Sierra testified that he is a custodian of records for T-Mobile. Sierra reviewed the tip sheet for the call detail record for defendant's phone. Based on the record, he testified that on July 20, 2017, at 3:48 p.m., defendant's phone received an incoming phone call that was connected for 34 seconds. He further testified that the call did not go to voicemail and that "[s]ince it was an incoming call and it does have a duration, it would be considered a connected call." He also testified that earlier on July 20, 2017, at 2:48 p.m., defendant's phone received an incoming call that was connected for five seconds and that call did not go to voicemail either.

¶ 75                                  c. Christian Faber

¶ 76    Faber testified that, in 2017, he worked for defendant. He testified that the trading market was open 23 hours a day, except on weekends, and they would always be ready to take orders from clients even if they were not physically on the trading floor. At the brokerage, they would communicate with their international clients via the Bloomberg terminal, which had a chat system. The Bloomberg terminal was accessible via defendant's computer or phone. Faber would access the Bloomberg terminal whenever defendant was not in the office. If defendant was not at work, Faber would communicate with defendant via phone call or text message. Faber testified that he was familiar with defendant's family and they both had sons close in age to one another. Faber had been to defendant's home on a few occasions. He testified that he was also familiar with Morrar, who he had met a few times. During the summer of 2017, Faber and defendant would both typically arrive at work around 6:30 a.m., defendant would leave around 2 p.m., and Faber would stay until 4 p.m.

¶ 77    Regarding July 20, 2017, Faber testified that he recalled defendant leaving work before 2 p.m. and he recalled calling defendant at 3:48 p.m. but he did not recall if they spoke at that time. He recalled speaking with defendant sometime later between the hours of 4 and 6 p.m. He stated

that the conversation was regarding a particular order from a client. On July 22, 2017, he testified that he spoke with defendant on the phone and defendant informed him that Morrar had been murdered. Faber stated that defendant seemed sad and distraught but he did not recall defendant saying anything else regarding the murder.

¶ 78 On cross-examination, the State presented a printout, which Faber identified as being sent by defendant in the Bloomberg chat on July 20, 2017, at 1:10 p.m. The message read:

> "I am going to switch out with Christian for the balance of the day. I have a baseball celebration party to attend this evening (Michael Junior's team won world series in his little league). I will also have my front end with me for the duration. Please tap if need support. Until then, thank you."

Faber testified that that was a message that would be sent out to all of their clients so they would know defendant and Faber's whereabouts. A second message from defendant sent a minute later read: "And here is Christian with the weather."

¶ 79 Faber testified that he was at work the following day, July 21, 2017. He stated that he could not remember whether defendant was at work that day. He confirmed that when he spoke to Detective Murphy on August 10, 2017, he stated that defendant had not come to work on July 21. Additionally, he confirmed that before the grand jury on February 6, 2018, he testified that defendant did not come to work on July 21. He also stated that he could not remember whether he had told Detective Murphy that defendant had informed him on July 22, 2017, that Morrar had been shot twice in the head. Also, when confronted with his grand jury testimony, wherein he stated that "[defendant] told me he was shot" and "I think he told me he was shot twice in the head," Faber stated that he could not remember if that is what he said before the grand jury. Faber

further confirmed that he had a close working relationship with defendant and he would help him if he could.

¶ 80 Faber testified that he had read newspaper articles regarding Morrar's murder a few days after July 20, 2017, and he stated the article stated that Morrar had been shot twice in the head. He also confirmed that he received a text message from defendant on July 22, 2017, prior to the phone call which stated "I'm all messed up. [Morrar] is dead."

¶ 81                                      d. Shawna Pelko

¶ 82 Shawna testified that she lived in the Willow Springs home with her husband and children in the summer of 2017. Sometime after Morrar's death, she filed for divorce from defendant. She described the Willow Springs home as a sprawling ranch on about an acre of land, there was a chicken coop on their property, and defendant tended to the chickens. She testified that during this time period, they were having marital issues and defendant was abusing Vicodin. She testified that she was familiar with Morrar but she did not know him well.

¶ 83 Turning to July 20, 2017, Shawna testified that on that day she was at home with the children and she was not working at that time. Michael Jr. had a friend over and the boys were selling lemonade in front of the house. She stated that defendant went to work that day at his usual time of 6 a.m. and returned home around 4 p.m. She observed him walking around in the backyard talking on the phone. She stated that she did not remember him going to the lemonade stand. At some point, the family took Shawna's car, an Acura MDX, to the pizza restaurant. She believed that they stayed at the party for about an hour. She stated that when they arrived home, defendant began working on his trading platform because he had received a call from a client during the pizza party. She testified that defendant went to work the next day, July 21, 2017. She later found out about Morrar's death but did not recall when or how she found out. After Morrar's death, she

stated that defendant became depressed, lost weight, and his prescription drug use increased. At some point, the family tried to have an intervention with defendant. Also after Morrar's death, a security system was installed in the home with multiple security cameras.

¶ 84    On cross-examination, Shawna stated that she was not exactly sure what time defendant arrived home on July 20, 2017, but that it was sometime in the afternoon around 4 p.m. She stated that she suspected that defendant was selling marijuana but did not know for sure. When they left for the party, she did not notice any cars missing. Regarding the pizza party, she testified that defendant left the party for some time and she did not know where he was but he said that he went to get his tablet because a client wanted to place an order. When asked about defendant going to work on July 21, 2017, she stated that he either told her he was going to work or she assumed that is where he was going but that he left at the usual time he left for work.

¶ 85                                    e. Michael Pelko, Jr.

¶ 86    Michael Jr. testified that he had a cell phone and sometimes he would call his father even though they were both at home. On July 20, 2017, he had a lemonade stand at the front of the house with a friend. He recalled seeing his father that day and his father gave him $20 and took a cup of lemonade. On cross-examination, he stated that he did not remember what time he saw his father that day, what time they went to the pizza party, or what time they got home. He also did not recall his father leaving the pizza party.

¶ 87                                    5. Rebuttal

¶ 88    Martin Walsh, a licensed private investigator, testified that the defense hired him to investigate McDaniel and Nagle, as well as McDaniel's brother, Jason McDaniel. He conducted background checks, investigated their social media profiles, and learned their home addresses. He only made contact with Jason when he knocked on his door and asked Jason if his brother was

living there with him, which he was not. He did not make contact with McDaniel but he did conduct surveillance of him for five or six days. He merely confirmed that an "Eric McDaniel" existed.

¶ 89    Detective Murphy was recalled on rebuttal. He confirmed that at no time during any of his interviews with defendant on July 23, 2017, July 26, 2017, and January 16, 2018, did defendant state that Morrar had borrowed his car or mention McDaniel's name.

¶ 90    Ismial was also called as a rebuttal witness. Before Ismial left California for Chicago, he called several people, including defendant, to try to find his brother. Over the phone, defendant informed Ismial that he had last seen his brother when they took a smoke break around 2 p.m. on July 20, 2017. Defendant did not tell Ismial that he had picked up Morrar or that Morrar had borrowed his car. Ismial further testified that he was not aware that his brother was going to conduct a drug deal that afternoon and denied sending his brother marijuana. When Ismial called defendant to inform him that Morrar had died, he did not tell defendant that Morrar had been shot twice in the head. Ismial identified three pictures of McDaniel. On cross-examination, Ismial identified an article related to his brother's death. He noted that the article came out on the Monday following his brother's death, which would have been July 23, 2017, and accurately stated that his brother had been shot twice in the head.

¶ 91                               B. Jury Instructions

¶ 92    A jury instruction conference took place at the close of evidence. The defense proffered an instruction regarding alibi, which was not an Illinois Pattern Instruction (IPI). The instruction stated:

> "The defendant has introduced evidence that at the time of the charged offenses he was not present at the place where the offenses are alleged to have been committed.

Evidence that a defendant was not present at the scene of the charged offense is commonly known as the evidence of alibi.

Even though the defendant has introduced the evidence, the defendant has no obligation to prove that his alibi is true. The burden of proving beyond a reasonable doubt that the charged offenses were committed and that the defendant committed them remains on the State."

The defense asserted that the non-pattern instruction was supported by caselaw, including *People v. Jackson*, 3 Ill. App. 3d 303 (1971). The State objected to the instruction.

¶ 93    The court rejected the instruction. In its ruling, the court stated that the contents of the proposed instruction were not accurate and there was no reason to explain what the type of evidence heard was called.

¶ 94                                    C. Jury Verdict

¶ 95    On August 23, 2019, the jury found defendant guilty of first degree murder and additionally found that defendant used a firearm in committing the offense. On September 17, 2019, defendant filed a motion for acquittal notwithstanding the verdict. The court denied the motion on September 23, 2019.

¶ 96                                D. Posttrial Proceedings

¶ 97    Defendant's sentencing hearing took place on November 1, 2019. The trial court sentenced him to 30 years' imprisonment for first degree murder and an additional 25 years pursuant to the mandatory firearm enhancement, for a total of 55 years' imprisonment. On the same day, defendant moved the court to reconsider his sentence, which the court denied.

¶ 98    Also on the same day, defendant timely filed this appeal.

¶ 99                                    II. ANALYSIS

¶ 100   On appeal, defendant argues that (1) the evidence was insufficient to prove him guilty of first degree murder beyond a reasonable doubt; (2) the trial court erred in allowing the State to elicit testimony from Dr. Eckhardt, which was based on expert opinions that had not been disclosed prior to trial in violation of Illinois Supreme Court Rule 412; and (3) the trial court abused its discretion and committed structural error when it refused to include defendant's tendered nonpattern alibi jury instruction.

¶ 101                           A. Sufficiency of the Evidence

¶ 102   When a defendant challenges his conviction, contending that the evidence was not sufficient to prove him guilty, a reviewing court (1) considers all of the evidence in the light most favorable to the State and (2) determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Swenson*, 2020 IL 124688, ¶ 35. This standard means that this court "must allow all reasonable inferences from the record in favor of the prosecution[,]" but we "may not allow unreasonable inferences." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Because it is the jury's responsibility to weigh, resolve conflicts in, and draw reasonable inferences from the evidence, we may not retry the defendant or substitute our judgment for that of the jury  regarding witness credibility or the weight of the evidence. *People v. Jackson*, 2020 IL 124112, ¶ 64. We will not reverse a conviction unless the State's evidence is "so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt as to defendant's guilt." *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 103   The "reasonable doubt" standard applies regardless of whether the evidence is direct or circumstantial (*People v. Jackson*, 232 Ill. 2d 246, 280 (2009)), and a criminal conviction may be based solely on circumstantial evidence (*People v. Patterson*, 217 Ill. 2d 407, 435 (2005)). "The

trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 104   To sustain a conviction for first degree murder as charged in this case, the State was required to prove beyond a reasonable doubt that defendant, in performing the acts which caused death, intended to kill or do great bodily harm to a person, or knew that such acts will cause such death or great bodily harm. 720 ILCS 5/9-1(a)(1) (West 2018). Additionally, because the State sought the 25-year statutory firearm enhancement, it also had to prove beyond a reasonable doubt that during the commission of the murder, defendant personally discharged a firearm that proximately caused the death of the victim. 730 ILCS 5/5-8-1(a)(1) (West 2018).

¶ 105   Defendant's main argument on appeal is that the cell phone evidence objectively confirms his alibi defense, and thus, it was impossible for a rational factfinder to conclude beyond a reasonable doubt that he committed the murder. Additionally, defendant argues that the State's case was not just wholly circumstantial but was also based on conjecture and speculation. In support, he points out several alleged weaknesses in the State's evidence. In response, the State contends that the evidence against defendant, albeit circumstantial, was overwhelming and recites a litany of evidence that points to defendant as Morrar's killer. The State also contends that defendant's alleged alibi was not corroborated as none of the evidence provided by defendant's witnesses, other than defendant himself, proved that defendant could not have committed the murder.

¶ 106   Based on our examination of the evidence in light of the principles set forth above, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. Video surveillance showed that defendant was Morrar's last known contact as the cameras showed

that defendant left the parking garage in his Santa Fe and picked up Morrar nearby. Defendant's cell phone activity indicated that his phone was travelling on Interstate 55 between 2:00 and 2:46 p.m. towards his Willow Springs home. Video surveillance then showed the Santa Fe in the alley of 5319 Calumet; an individual in a white shirt opened the front passenger door at 3:48 p.m. and drove away moments later. The evidence showed that Morrar was found deceased in an alley near 5319 Calumet with two gunshot wounds to the head on July 20, 2017, around 3:50 p.m. The medical examiner testified that Morrar's fixed lividity, which becomes set one to two hours after death, was consistent with sitting upright with his back against a surface. The bullet and bullet fragments recovered from Morrar's body were confirmed to be .22 caliber. An investigation of defendant's Santa Fe revealed multiple blood stains in the passenger seat, which were attributed to Morrar. Defendant's fingerprint was found on the exterior of the front passenger door of the Santa Fe. A search of defendant's home revealed that he had a large collection of firearms, including several .22-caliber firearms, such as a .22-caliber rifle which was not conclusively ruled out as having fired the bullet. Defendant had also purchased a .22-caliber revolver in 2008, which was not found in the home and which defendant claimed he traded away. A forensic investigation of his cell phone data showed no outgoing activity between 2:46 p.m. and 4:50 p.m.

¶ 107    The evidence revealed multiple instances where defendant lied about his last contact with Morrar. Defendant lied to the police multiple times, he lied to his wife, and he lied to Morrar's brother. It is well-established that false exculpatory statements are probative evidence of consciousness of guilt. *People v. Beaman*, 229 Ill. 2d 56, 81 (2008); *People v. Milka*, 211 Ill. 2d 150, 181 (2004); see also *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 94 ("Attempts to deflect the investigation prove consciousness of guilt"). There was also impeachment evidence presented that showed that Faber previously stated that defendant told him in a phone conversation

on July 22, 2017, that Morrar was shot twice in the head, even though that detail was not public knowledge and Ismial testified that he did not give defendant that information. Additionally, there is a recorded phone call from defendant to Shawna from March 21, 2018, during which defendant still had not informed his wife that Morrar and McDaniel had borrowed his car. Then, on another recorded call on March 23, 2018, defendant told his wife that he and Morrar switched cars, although defendant claimed at trial that he was referencing a different day in that phone call. On that call, he also told his wife that he left the pizza party in order to switch cars, as McDaniel and Morrar had dropped off his car and left in McDaniel's brother's car, although at trial defendant testified that he left the party to retrieve his tablet.

¶ 108    The evidence presented also suggested a motive for defendant murdering Morrar. In late June 2017, defendant and Morrar had argued and there was testimony that defendant owed Morrar $1,100 for marijuana he had purchased from Morrar. There were text messages between the two suggesting that they were not on good terms and that Morrar was trying to collect on defendant's debt to him. At the height of these texts, Morrar stated that he was concerned about defendant's "tone" and that their relationship had changed. Defendant responded by questioning whether he should be worried about his family's safety and that he would be putting appropriate "safety measures in place." Defendant testified that Morrar's backpack contained marijuana and during the search of defendant's home, a large amount of marijuana was found in the ceiling of defendant's home.

¶ 109    The State's theory based on this evidence was that: defendant owed Morrar money for the marijuana he purchased from him; on July 20, 2017, defendant picked up Morrar in his Santa Fe, shot Morrar, drove to his Willow Springs home with Morrar's body still in the passenger seat, dropped off his cell phone at his home, drove to the alley, dumped Morrar's body, and returned to

Willow Springs; he then went with his family to a pizza party for his son's little league team; and he left the restaurant and went home briefly to clean his car before returning to the party. As recounted above, the evidence presented at trial supports this timeline. We conclude that, in viewing the evidence in the light most favorable to the State, there is sufficient evidence to support this theory, which is based on reasonable inferences flowing from the circumstantial evidence, and for a rational factfinder to find defendant guilty beyond a reasonable doubt. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (stating that reviewing courts must allow all reasonable inferences in favor of the State).

¶ 110    Moreover, it is clear from the verdict that the jury found that defendant's version of the day's events lacked credibility. In defendant's version, defendant picked up Morrar and then McDaniel; they drove together to defendant's Willow Springs home; Morrar and McDaniel drove away to conduct a drug deal with Nagle; while home, defendant spoke to Faber on the phone for 34 seconds; his car was returned to Willow Springs while he was at the pizza party; he saw no blood stains or signs of struggle in his car; and he lied to the police about the events of that day repeatedly because he was afraid of McDaniel and Nagle. Although defendant challenges several pieces of evidence and their import, or lack thereof, it is only necessary that the jury find that the evidence, circumstantial or direct, as a whole, reflected guilt beyond a reasonable doubt. The jury is not required to disregard inferences which flow normally from the evidence and to raise any hypothesis of innocence put forward by the defendant to the level of reasonable doubt. *Hall*, 194 Ill. 2d at 332. Here, the jury clearly did not find defendant's narrative to be credible in light of the State's evidence. See *People v. Evans*, 209 Ill. 2d 194, 212 (2004) (factfinder is not obliged to accept any proffered explanation compatible with the defendant's innocence). We cannot say that it would be irrational to find that defendant lacked credibility where he lied not only to the police

repeatedly but also to his wife as to what occurred on July 20, 2017. Moreover, defendant's arguments regarding the alleged weaknesses of the State's evidence, which we discuss briefly below, were presented to the jury, and yet, the jury returned with a guilty verdict. It is not within the province of this court to second-guess jury determinations. See *People v. Gray*, 2017 IL 120958, ¶ 35; *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 111　Nevertheless, we will address defendant's various arguments on appeal. First, however, we must dispel any notion that *People v. Holsapple*, 30 Ill. App. 3d 976 (1977), which forms the basis of defendant's sufficiency of the evidence arguments, may be relied upon to support reversal. Defendant cites to *Holsapple* as an example of a murder conviction that was vacated because it rested on insufficient circumstantial evidence. He further asserts that, like in *Holsapple*, the evidence in his case was circumstantial and the State failed to negate his alibi with anything but speculation and conjecture.

¶ 112　In *Holsapple*, the defendant was convicted of first degree murder, largely based on the victim informing a neighbor that the defendant was arguing with her and would not leave her home two days before her body was found in her home. 30 Ill. App. 3d at 977-79. On appeal, the reviewing court noted that the evidence in the case was "wholly circumstantial" and that the circumstantial evidence could have permitted the jury to find the defendant guilty of murder "were it not for other factors which we must take into consideration." *Id.* at 977, 989. The court stated that the evidence did not adequately exclude the possibility that someone other than the defendant killed the victim. *Id.* at 990-91. Therefore, the reviewing court concluded that "it cannot be said that the facts proved were inconsistent with any reasonable hypothesis of innocence" and reversed the finding of guilt. *Id.* at 992.

¶ 113 The court in *Holsapple* applied the reasonable-hypothesis-of-innocence standard of review, stating that "[i]n order to sustain the conviction, the evidence must exclude any reasonable hypothesis of innocence." 30 Ill. App. 3d at 990. This requirement was expressly rejected by our supreme court in *People v. Pintos*, 133 Ill. 2d 286, 291 (1989). In *Pintos*, the supreme court noted that the reasonable hypothesis of innocence standard was often used in cases that were based on circumstantial evidence but went on to hold that "the reasonably hypothesis of innocence standard of review is no longer viable in Illinois." *Id.* at 291 (citing *People v. Eyler*, 133 Ill. 2d 173 (1989), and *People v. Linscott*, 114 Ill. 2d 340 (1986)). Instead, in all criminal cases, regardless of whether the evidence is direct or circumstantial, the court held that the reasonable doubt test should be applied in reviewing the sufficiency of the evidence. *Id.* To the extent that *Holsapple* advocates the "reasonable hypothesis of innocence standard," it has been implicitly overruled by our supreme court in *Pintos*.

¶ 114 We return to defendant's remaining arguments on appeal. Defendant contends that (1) it is undisputed that he could not have committed the murder because he answered a phone call at his home in Willow Springs at the time that his car was in the alley (the Faber phone call); (2) there was no evidence that he used an app to remotely answer his cell phone; (3) the State failed to produce any evidence of defendant owning or possessing a .22-caliber semi-automatic handgun, which was used in the murder; and (4) there was no evidence that defendant was the "individual in the white-collared shirt" exiting the Santa Fe in the alley at 3:46 p.m.

¶ 115 We first address the relevance and effect of the Faber phone call. This is the crux of defendant's argument on appeal. He claims that "objective facts established at trial make it implausible for any rational jury to find [him] guilty beyond a reasonable doubt." The objective facts to which defendant alludes are his cell phone data. Specifically, he claims that the phone call

from Faber, which connected to defendant's cell phone near his Willow Spring home at 3:48 p.m. objectively contradicts the State's assertion that defendant left Morrar's body in the alley at 3:46 p.m. Essentially, he asserts that this phone call corroborates his alibi defense.

¶ 116    "The weight to be given alibi evidence is a question of credibility for the trier of fact [citation], and there is no obligation on the trier of fact to accept alibi testimony over positive identification of an accused [citations]." *People v. Slim*, 127 Ill. 2d 302, 315 (1989). Although it is undeniable  that defendant could not have been at 5319 Calumet at 3:46 p.m. and at his home in Willow Springs at 3:48 p.m. to receive that phone call, the evidence presented regarding the phone call was at best inconclusive as to whether this call was an actual conversation between Faber and defendant or simply Faber leaving a voicemail. The forensic cell phone extraction and the T-Mobile records showed that it was an incoming phone call which connected to defendant's phone and lasted 34 seconds. Although Sierra, the T-Mobile custodian, testified that it was a connected call that did not go to voicemail, Mejia testified that she was not aware of how the forensic tool determined whether a call went to voicemail or included talk time or if the tool could even differentiate between the two. Raschke confirmed that that call utilized cell phone towers near defendant's Willow Springs home, which is consistent with the phone being at or near the home at the time of the 3:48 p.m. phone call. He could not say definitively whether the 34 seconds was talk time or that a conversation took place. He further testified on cross-examination that the 34 seconds was the "call setup time that's going on behind the scene[s] within the network and the ring time[.]" We would also note that, during the testimony of both Raschke and Mejia, there was some uncertainty as to why phone calls that were sent to voicemail would not show up in the report as missed phone calls. As such, there was simply no consensus as to whether the call included a conversation or if it went to voicemail. It was only apparent that the call was incoming, connected

to defendant's phone, and lasted 34 seconds. Moreover, Faber's testimony did not resolve this ambiguity as he did not recall whether he actually spoke to defendant at that time, only that he remembered calling him regarding a client.

¶ 117   Additionally, there was evidence that defendant used apps to access his devices remotely. For instance, Mejia testified that defendant's phone had TeamViewer installed, which had the ability to remote access other devices and was downloaded to defendant's phone at the beginning of July 2017. TeamViewer, according to Mejia, could be used to access the phone remotely via the Internet. Defendant testified to the contrary—that TeamViewer could only be used through Bluetooth. According to the cell phone extraction, neither of these apps were accessed between 2 and 4 p.m. on July 20, 2017, but Mejia testified that the forensic tool utilized did not recognize every app and needed regular updates for new apps. This conflict in testimony was within the purview of the jury to resolve. See *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 118   In his reply brief, defendant takes particular issue with Mejia's expert witness testimony, arguing that the flaws in her testimony made it impossible for any trier of fact to accept any part of the testimony presented. He contends that her testimony regarding the remote access apps and their usage on his phone was based on speculation and she did not actually know the functions of these apps nor how the forensic tools worked. However, the jury is free to accept the opinion of one expert witness over another or accept part and reject part of each expert's testimony. *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 77. Moreover, as we have previously stated, it is the jury's role to weigh the testimony and determine the credibility of the witnesses and we will not circumvent the jury's role. Additionally, the points defendant has raised here on appeal were raised at trial through his counsel's cross-examination of Mejia. See *In re Detention of Erbe*, 344 Ill. App. 3d 350, 372 (2003) (noting that cross-examination and rebuttal witnesses offered the respondent

the opportunity to challenge the State's experts' opinions in the proper forum, which is during trial in front of the jury). In point of fact, Mejia admitted during her testimony that she was unaware of how specific aspects of her forensic tools worked and she was not overly familiar with the remote access apps. The jury was then free to come to its own conclusions regarding the weight of her testimony.

¶ 119 Finally, defendant contends that the testimony of Faber, Shawna, and Michael Jr. corroborated his alibi defense. We note that when a defendant presents an alibi defense, the jury is "not obligated to find the testimony of alibi witnesses to be more credible than the testimony of the State's witnesses, especially where the alibi witnesses are related to the accused and possess an obvious bias." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 90. Furthermore, there was no testimony, other than from defendant, to establish that defendant was at home at that time of Faber's call. As noted, Faber could not recall whether defendant actually answered the 3:48 p.m. phone call. Additionally, neither Shawna nor Michael Jr. recalled what time defendant came home that afternoon.

¶ 120 For these reasons, we cannot say that it is an objective fact based on the evidence that defendant spoke to Faber on the phone at 3:48 p.m. while at his home. Thus, it was not irrational for the jury to disregard defendant's alleged alibi defense. See *Siguenza-Brito*, 235 Ill. 2d at 229 (jury is not required to accept any possible explanation compatible with the defendant's innocence and raise it to the status of reasonable doubt).

¶ 121 Defendant also points out weaknesses in multiple pieces of the State's evidence, which he claims demonstrate reasonable doubt as to his guilt, particularly regarding the firearms evidence and the surveillance video from the alley. Essentially, defendant asks us to substitute our judgment for that of the jury and resolve conflicts in the evidence in his favor, which we cannot do. *Corral*,

2019 IL App (1st) 171501, ¶ 91; *People v. Tenner*, 205 Ill. 2d 411, 428 (2002). It is not the function of this court to retry the defendant (*Siguenza-Brito*, 235 Ill. 2d at 228), and as we have stated, defendant presented his evidence and made arguments to the jury regarding the weaknesses in the State's case, and yet, the jury found defendant guilty of murder. Nonetheless, we briefly address these two arguments, which we ultimately find to be without merit.

¶ 122  Defendant challenges the firearms evidence or lack thereof, where no murder weapon matching the bullets recovered from the victim's body was located or traced to him. "Proof of the connection between the gun and the defendant and the crime may be circumstantial." *People v. Araujo*, 261 Ill. App. 3d 393, 395 (1994). It is clear from the testimony that defendant had a large collection of firearms, including several .22-caliber rifles that were not excluded from being the murder weapon. Moreover, at one point defendant did, in fact, own a .22-caliber revolver, which he claims he traded to a man named Don Schenkel. Simply because the murder weapon was not found or directly linked to defendant does not negate a finding of guilt. See *People v. Hoffstetter*, 203 Ill. App. 3d 755, 773 (1990) (circumstantial evidence permitted showing that the victims were killed by .22-caliber gunshots and the defendant had access to a firearm that could have fired those shots around the time of the murders).

¶ 123  Further, defendant claims that the State's firearms expert testified that it was a .22-caliber semi-automatic handgun that killed Morrar, and defendant never, at any point, owned .22-caliber semi-automatic handgun, only .22-caliber rifles and a revolver. In fact, as the State points out, Nudera testified that the bullets could have been fired from either a .22-caliber handgun or a .22 caliber rifle. She further testified that she could not conclusively determine whether the bullets could have been fired from the submitted .22-caliber rifle. Thus, defendant's argument on this point is without merit.

¶ 124 Defendant further claims that the record is devoid of any evidence identifying defendant as the individual in the white collared shirt exiting the Santa Fe at 5319 Calumet at approximately 3:46 p.m. Presumably, that person is the individual who left Morrar's body in the alley. However, a review of the record belies defendant's statement that the individual exiting the Santa Fe was wearing a white *collared* shirt. Detective Murphy testified that the individual exiting the Santa Fe was wearing a white shirt, but that it was not definitively clear whether the shirt had a collar. From our review of the evidence, we agree that it is unclear from the video whether the shirt had a collar. Moreover, there is testimony in the record that defendant was wearing a white shirt underneath his button-down collared shirt. It would not be implausible for a rational factfinder to find that defendant was the individual exiting *his* Santa Fe at 3:46 p.m.

¶ 125 As a final note, we reject defendant's reliance on *People v. Sanchez*, 2018 IL App (1st) 143899. In *Sanchez*, we reversed the defendant's murder conviction after finding his incriminating statement, the State's primary evidence, to be involuntary. *Id.* ¶ 73. Defendant cites portions of *Sanchez* noting that "[n]o physical evidence connected [the defendant] to the crime[,]" the weapon and casings were never found, and no witness saw the defendant with a gun. However, the case before us bears little resemblance to *Sanchez*. Although it is true that much of the State's case in *Sanchez* was based on circumstantial evidence, the court did not reverse the conviction solely on that basis. Rather, the court was particularly concerned with the improperly admitted confession. Thus, *Sanchez* is clearly distinguishable where in this case the jury did not rely on any improperly admitted evidence, and certainly nothing comparable to the weight of a confession.

¶ 126 Accordingly, considering the record in the light most favorable to the State, we conclude that the evidence is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to defendant's guilt in the murder of Morrar.

¶ 127                    B. Expert Disclosure Violation

¶ 128   Defendant next claims that the trial court committed plain error in allowing Dr. Eckhardt to testify to opinions that had not previously been disclosed to the defense in violation of Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001). Specifically, he challenges Dr. Eckhardt's opinion that "that the patterning on Morrar's bloodied t-shirt matched the conclusion that Morrar was sitting upright in [defendant's] front passenger seat." He further claims that he was "severely prejudiced" by this testimony as it was not disclosed prior to the start of trial and the testimony placed Morrar's body in defendant's vehicle. However, later on in his argument, defendant also takes issue with Dr. Eckhardt's testimony following the sidebar that the fixed lividity of Morrar's body was consistent with sitting upright in a vehicle. He claims that he was also prejudiced by this testimony as it was not disclosed. Essentially, defendant challenges the whole of Dr. Eckhardt's testimony regarding anything consistent with Morrar being in defendant's vehicle.

¶ 129   Defendant concedes that this error was forfeited because he did not properly preserve it. Although he did object to Dr. Eckhardt's testimony regarding his opinions on the patterning of the passenger seat matching Morrar's bloodied T-shirt during the trial, he did not include the error in his posttrial motion. See *People v. Harvey*, 222 Ill. 2d 368, 385 (2004) (an issue is preserved where the party objects at trial and raises the issue in a posttrial motion). As such, defendant requests that this court review the error for plain error and argues that both prongs of the plain error doctrine apply.

¶ 130   In response, the State contends that defendant did not merely forfeit the error but he waived it and thus, the plain error doctrine does not apply. In the alternative, the State contends that the trial court did not commit plain error in allowing Dr. Eckhardt's line of testimony on this issue.

¶ 131   Rule 615(a), from which the plain error doctrine is derived, provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under the plain error doctrine, it is well established that "a reviewing court may consider an unpreserved error if (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Birge*, 2021 IL 125644, ¶ 24 (citing *Piatowski*, 225 Ill. 2d 551, 564-65 (2007). "Under either prong, the defendant bears the burden of persuasion." *Id.* However, the first step in any plain error analysis is to determine if an error actually occurred. *Id.* at 565.

¶ 132   Rule 412 requires that the State, when requested by the defense, disclose certain material and information to a criminal defendant, including, in relevant part, "any reports or statements of experts, made in connection with the particular case, including the results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert[.]" Ill. S. Ct. R. 412 (eff. Mar. 1, 2001).

¶ 133   The purpose of this rule, like all discovery rules, is to protect the defendant from unfairness, surprise, or inadequate preparation and to afford the defendant the opportunity to investigate the circumstances from which the evidence arose. *People v. Leon*, 306 Ill. App. 3d 707, 712-13 (1999). Compliance with Rule 412 is mandatory and violations are not to be easily excused. *Id.* at 713.

¶ 134   Here, the State showed Dr. Eckhardt photos of Morrar's body in his wrinkled shirt and defendant's passenger seat and questioned him on his opinion based on those photos. Defense counsel objected to Dr. Eckhardt providing an opinion on the pattern of lividity on the victim's

body matching the passenger seat because he was not qualified to offer such an opinion and because that opinion had not been disclosed previously in Dr. Eckhardt's report. After interviewing Dr. Eckhardt during the sidebar, defense counsel reiterated that its objection was only to testimony "regarding anything from the seat compared to the blood stain on the shirt." After some discussion, the trial court agreed that such testimony would be outside of the doctor's expertise. The trial court ruled that the doctor could testify to anything relevant to the seat and the body's lividity if it was consistent with being in that seat and bleeding after being shot but not to anything involving the seat pattern. Defense counsel again stated: "The separate issue of lividity as long as it doesn't relate to the seat that's fine." The State agreed that it would not question the doctor on the patterning of the seat compared to the victim's shirt. Defendant did not object during any of Dr. Eckhardt's testimony regarding Morrar's lividity following the sidebar.

¶ 135   As to what was disclosed prior to trial, the record reveals that Dr. Eckhardt provided a Report of Postmortem Examination. As relevant here, it stated, "Fixed, purple lividity is distributed on the posterior surfaces of the body, except in areas exposed to pressure."

¶ 136   As stated previously, in order for the plain error doctrine to be triggered, there must first be an error. Our courts have defined two situations where the plain error doctrine will not be triggered. These situations are akin to one another but are described in slightly different terms. First, we have the situation where waiver is differentiated from forfeiture. Second, the courts have delineated the situation of invited error. We address the former first.

¶ 137   "Rule 615(a) is concerned with [forfeitures] that result from failing to bring an error to the trial court's attention." *People v. Townsell*, 209 Ill. 2d 543, 547 (2004). The United States Supreme Court, in addressing the plain error doctrine under federal law, stated: "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or

abandonment of a known right.' " *United States v. Olano*, 507 U.S. 725, 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); see also *People v. Hughes*, 2015 IL 117242, ¶ 37 (similarly distinguishing waiver from forfeiture). The Court continued: "Mere forfeiture, as opposed to waiver does not extinguish an 'error' " under the plain error doctrine. *Id.* Similarly, Illinois courts have held that "[w]hereas waiver precludes review, forfeiture permits review under the plain-error doctrine." *People v. Tapia*, 2014 IL App (2d) 111314, ¶ 46; see also *People v. Stewart*, 2018 IL App (3d) 160205, ¶ 20; *People v. Williams*, 2015 IL App (2d) 130585, ¶ 6.

¶ 138 The rule of invited error, however, is a procedural default similar to estoppel. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Essentially, "a party cannot complain of error which the party induced the court to make or to which that party consented." *Id.*; see also *People v. Carter*, 208 Ill. 2d 309, 319 (2003). Stated another way, "when a defendant procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, [he] cannot contest the admission on appeal." *People v. Bush*, 214 Ill. 2d 318, 332 (2005); see also *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989) ("[W]here *** a party acquiesces in proceeding in a given manner, he is not in a position to claim that he was prejudiced thereby."). Further, "[a]ctive participation in the direction of proceedings *** goes beyond mere waiver." *People v. Villareal*, 198 Ill. 2d 209, 227 (2001).

¶ 139 Both of these situations are applicable to the case before us. Here, defense counsel initialed objected to Dr. Eckhardt's testimony. Defense counsel then interviewed Dr. Eckhardt regarding his opinions outside the presence of the jury. Defense counsel then clarified its objections to the testimony and the court issued a ruling disallowing testimony regarding the matching of the seat to Morrar's bloodied shirt. Additionally, defense counsel stated that as long as Dr. Eckhardt did not testify regarding the seat matching the shirt, that would be fine. Because defense counsel

objected and subsequently acquiesced to the court's ruling regarding the extent of Dr. Eckhardt's testimony, we must find that this error was affirmatively waived or invited, rather than forfeited. For this reason, we decline to review the alleged error under the plain error doctrine.

¶ 140                                    C. Jury Instructions

¶ 141   Lastly, defendant argues that the court should have given the jury defendant's proffered instruction on alibi evidence. He asserts that the court abused its discretion and committed structural error by not so instructing the jury. As such, he requests that his conviction be reversed and remanded for a new trial. In response, the State contends that the jury was properly instructed and an alibi instruction is not recommended.

¶ 142   "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). "The decision whether to give a nonpattern instruction rests within the sound discretion of the trial court." *Id.* Whether the court's decision was an abuse of discretion will depend upon whether the tendered instruction is an "accurate, simple, brief, impartial, and nonargumentative statement of the law." *People v. Pollock*, 202 Ill. 2d 189, 210 (2002). "Refusal to give a non-IPI instruction does not constitute an abuse of discretion however, if there is an applicable IPI instruction and/or the essence of the refused instruction is covered by other given instructions." *People v. Nutall*, 312 Ill. App. 3d 620, 634 (2000). We review the jury instructions tendered as a whole to determine whether they fully and fairly cover the law. *Id.* at 633.

¶ 143   Defendant's tendered instruction stated as follows:

"The defendant has introduced evidence that at the time of the charged offenses he was not present at the place where the offenses are alleged to have been committed.

- 43 -

> Evidence that a defendant was not present at the scene of the charged offense is commonly known as the evidence of alibi.
>
> Even though the defendant has introduced the evidence, the defendant has no obligation to prove that his alibi is true. The burden of proving beyond a reasonable doubt that the charged offenses were committed and that the defendant committed them remains on the State."

¶ 144   In rejecting the instruction, the trial court stated there is no reason to inform the jury of the definition of alibi evidence and that the jury was properly instructed as to the law. In particular, the jury had been instructed as to the presumption of innocence and the burden of proof.

¶ 145   We agree with the trial court. The jury had already received the necessary instructions regarding the burden of proof and the presumption of innocence. As such, defendant's tendered instruction would have been largely superfluous. Moreover, the committee note to Illinois Pattern Jury Instructions, Criminal 24-25.05 (Oct. 29, 2021), recommends that no instruction on alibi be given to the jury based on the stated policy of the committee that instructions should avoid commenting on particular types of evidence. See *People v. Poe*, 48 Ill. 2d 506 (1971) (relying on the committee notes, the court held that the trial court did not err in refusing to instruct the jury on alibi evidence).

¶ 146   Finally, we briefly address defendant's argument that caselaw requires that if there is even slight evidence supporting a defendant's theory of the case, a corresponding instruction on the defendant's theory must be given. *People v. Hari*, 218 Ill. 2d 275, 296 (2006). He further cites to *People v. Martin*, 62 Ill. App. 2d 203, 212 (1965), for the proposition that, in particular, "if there is any evidence tending to prove an alibi, the trial court should give a proper instruction on that issue."

¶ 147   We point out that *Martin, an appellate court decision,* was issued prior to our supreme court's decision in *Poe*, which, as noted, specifically relied on the committee notes in finding that there is no error in failing to give an alibi instruction. See also *People v. Brandon*, 197 Ill. App. 3d 866, 883-84 (1990) (following *Poe* and the committee notes in finding that the trial court did not err in refusing to give an alibi instruction); *People v. Daniels*, 272 Ill. App. 3d 325, 347 (1994) (same). Obviously, *Poe* is controlling. Accordingly, the trial court's refusal to give the tendered jury instruction on alibi was not error (*People v. Rivera*, 72 Ill. App. 3d 1027, 1041 (1979)), and we find no abuse of discretion in the court's refusal (*People v. Simms*, 192 Ill. 2d 348, 412 (2000)).

¶ 148                                 III. CONCLUSION

¶ 149   For the reasons stated, we affirm the judgment of the circuit court.

¶ 150   Affirmed.